(2) The dual sovereignty recognized by the Constitution becomes a relic of the past.

(3) The distribution of powers among the several branches of the government will no longer characterize the system.

(4) The principles of individual liberty under the law will have no place in the new regime.

Such a result as this is more than the amendment of the Constitution. It is nothing short of the destruction of the same. How an individual can seek this result and at the same time state that he is attached to the principles of government as they are disclosed in the Constitution, and will support and defend them against all enemies, foreign and domestic, is beyond comprehension. This is a result that cannot be accomplished by the orderly process of amendment. Its consummation is impossible, short of revolution.

No criticism is offered of the individual who entertains the views held by the applicant. That is his privilege. But the right to amend the Constitution, and to advocate its alteration, is a privilege of the citizen, and not of an alien. One who entertains the views expressed by the applicant is not "attached to the principles of the Consti-

tution," and is not "well disposed" toward the same.

He is not "well disposed" because he is hostile to our form of government. He is not "attached to the principles of the Constitution" because there is lacking such a conviction as would lead him to actively support and defend the same.

Citizenship is available for aliens who in good faith, by example, and mental attitude disclose their sincere adherence to the political philosophy of the Constitution. Those who come in any other frame of mind are asking for a privilege that they have no right to receive. No matter how well founded their political beliefs may be, conformity to principles of the Constitution is indispensable.

The petition will be denied. To the ruling of the court the applicant is allowed an exception.

## CONTRACT CARTAGE CO. v. MORRIS et al.
### No. 317–D.

District Court, E. D. Illinois.
June 14, 1932.

438

Allen & Dalbey, of Danville, Ill., for plaintiff.

Oscar Carlstrom, Atty. Gen., B. L. Catron, Asst. Atty. Gen., and W. E. Sampson, of Springfield, Ill., for defendants.

Before ALSCHULER, Circuit Judge, and LINDLEY and WOODWARD, District Judges.

WOODWARD, District Judge.

Plaintiff, by its bill, seeks to enjoin state officers from enforcing subsection 5 of section 3 of the Motor Vehicle Act of Illinois, as amended by act in force July 1, 1931, which reads as follows:

"The length of any single vehicle or combination of tractor and semi-trailer shall not exceed thirty-five feet. Where trailers are used the length of any vehicle, or vehicles, combined with their trailers, shall not exceed sixty-five feet until January 1, 1933 and after that date forty feet. Nor shall the length of any unit of the combination exceed thirty-five feet. But such limits in length shall not apply to fire apparatus nor to the transportation of poles, piling, beams or other like structural units incapable of dismemberment and one unit of electrical machinery. Provided further, that no poles, piling, beams of like structural units incapable of dismemberment shall be transported over the highways of the State between sunset and sunrise, except where needed for emergency repair of

telegraph, telephone, electric railway, and electric power and light lines.

"Upon application the highway or street officials having proper jurisdiction over a particular highway may grant special permits in writing for the operation of vehicles or combinations of vehicles and trailers or semi-trailers exceeding the foregoing weights and dimensions. Such permits may be granted in the discretion of the highway or street officials when in their opinion an emergency exists warranting the granting of the permit. The permit shall be granted only for limited periods and for trips over designated highways and streets, at specified times and subject to such other conditions as such highway or street officials may prescribe, but in no case shall such permit exceed a period of ten days."

Illinois Session Laws 1931, pages 793, 794.

The validity of this legislation is challenged on the grounds:

(1) That it is violative of the Fourteenth Amendment to the Federal Constitution in that:

(a) It takes plaintiff's property without due process of law;

(b) It denies to plaintiff the equal protection of the law;

(2) That it is violative of the Commerce Clause of the Federal Constitution, in that it imposes an unreasonable burden on Interstate Commerce;

(3) That the proviso denies to citizens of states other than Illinois the privileges and immunities of citizens of the state of Illinois;

(4) That it contains an unauthorized delegation of legislative power.

Several other corporations, in like situation with plaintiff, by leave of court, intervened and prayed the same relief.

A court of three judges convened pursuant to 28 USCA § 380, granted a temporary restraining order, and later a preliminary injunction. The matter came on for final hearing on bill, answer, affidavits filed by the respective parties, and testimony of witnesses taken in open court.

The plaintiff is a corporation organized under the laws of the state of Michigan. It has a capital investment of more than $100,000 in trucks and semitrailers. It is engaged in transporting newly manufactured automobiles and motortrucks from various manufacturing plants in Michigan and Wisconsin over the public streets and highways into and through the states of Indiana, Illinois, Missouri, and Iowa. It owns and operates more than 100 vehicles of the tractor and semitrailer type. During the year 1930 it had contracts with more than 400 dealers and distributors in the states mentioned for the transportation of automobiles, 10,323 of which automobiles were transported into or through the state of Illinois, such transportation into or through Illinois yielding a gross income of upwards $207,000. It has outstanding long-term contracts with manufacturers and distributors of automobiles in Flint, Pontiac, and Detroit, Mich., Toledo, Cleveland, and Cincinnati, Ohio, South Bend, Ind., St. Louis, Mo., and Kenosha, Wis., for the transportation, by its trucks and semitrailers, of automobiles over the streets and highways of Illinois.

The motor vehicles used by the plaintiff in the transportation of automobiles on the streets and highways of the state of Illinois, and of the other states mentioned, are each made up of a motortruck operated by gasoline and a semitrailer. The semitrailer is a dependent transporting unit consisting of a loading platform approximately 50 feet in length, the front 10 feet of which is carried upon the rear platform of the motortruck and securely and permanently fastened thereto by a king bolt, and a single axle equipped with a pair of wheels which carry the rear portion of the loading platform. The entire length of combined motortruck and semitrailer is approximately 60 feet. The loading platform contains two 7-inch I-beams running lengthwise of the platform and so located thereon that when the vehicle to be transported is loaded onto the platform, the inside surfaces of the wheels of the loaded vehicle rests against the outside surface of one of the beams and the wheels themselves rest upon the platform. Four automobiles of a wheel base of 116 inches or three automobiles of a greater wheel base than 116 inches are loaded on the platform and transported.

The greater portion of automobile factories are located in the state of Michigan. Prior to 1917 the customary method of delivery of automobiles from factory to dealer or distributor was by rail freight transportation. During the World War, due primarily to a shortage of box cars available therefor, and due also to the rail congestion during such period, transportation of automobiles by rail freight declined very markedly. During the World War and about 1917 the "Drive Away Method" came into general use. Under the "Drive Away Method" an individual driver

was assigned to each motor vehicle to be delivered. This method had its disadvantages, in that frequently the bodies of the motor vehicles, both inside and out, suffered damages. Constant complaints were received from customers also that due to the incompetence, inexperience, or carelessness of the drivers, the motors themselves were seriously damaged. During the last two years the present method of transporting motor vehicles from factor to dealer or distributor by means of a truck and semitrailer has come into use. In fact, it has practically supplanted the "Drive Away Method," particularly in the states of the Central West. The method of delivery by truck and semitrailer is claimed to have advantages superior to the methods theretofore used, in that, among other things, the automobiles are delivered without damage to their bodies, the cost of transportation is less, and the ability to insure quick delivery by the dealer is increased.

During the last two years complaints against the use of the truck and the rigid semitrailer with lengths varying from 35 to 75, and perhaps 80 feet, were made to the state highway division of the department of public works and buildings. These complaints were predicated largely upon the use of vehicles of such length and rigidity on the type of improved highways in the state of Illinois. Under the State Bond Issue Acts of 1917 (page 696) and 1923 (page 512) and other legislation, the state of Illinois has constructed an extensive system of improved and hard-surfaced roads, at an approximate cost of $341,000,000. This system includes 10,560 miles of improved roads, of which 8,412 miles were state work and 2,148 miles were state-aid work. This system intersects the state of Illinois in all directions reaching all of the cities and most of the villages of any size or consequence. On the state roads approximately 425 miles are constructed with pavements 16 feet wide, 7,000 miles with pavements 18 feet wide, 687 miles with pavements 20 feet wide, and 300 miles with pavements more than 20 feet wide. On the State Bond Issue Routes are located many curves with radii varying from 36.4 feet to 1,000 feet. There are many curves of a radius of 100 feet or less, many others with a radius of 200 feet or less and more than 100 feet, many with a radius of 300 feet or less and more than 200 feet. There are also a large number of solid paved intersections where state routes meet or intersect one another in the metropolitan area near Chicago and at other places, constructed with a turning radi-

us of from 20 to 75 feet. At most of these places there is heavy traffic almost continuously and close traffic control is necessary.

Due to the type of construction of the Illinois improved road system, particularly with reference to the curves with the radii above referred to, the operation of the truck and semitrailer has given rise to dangers and inconveniences. These dangers and inconveniences are summarized in the affidavit of Frank T. Sheets, now and for many years last past the chief highway engineer of the state of Illinois in the department of public works and building, division of highways, as follows: "That when said automobile transports proceed around a curve of a radius of 200 feet or less, they do not and cannot keep on their own side of the road on pavements 18 feet and less in width, for the reason that because of the great distance between the rear wheels of the truck or tractor and the wheels of the semi-trailer, the wheels of the semi-trailer cut inside the track of the wheels of the truck or tractor, so great a distance that the width of one-half of the pavement is not sufficient for the course of the wheels and the body or frame of the transport, and a part of it necessarily gets over the center line of the pavement and interferes with vehicles proceeding in the opposite direction; that when one of said transports goes around a curve to the left on pavements 18 feet and less in width and the motor truck and front portion of the semi-trailer is on the traffic lane on the outside of the road, the rear end of the semi-trailer protrudes across the center line and into the inside traffic lane, thus obstructing the passage of other vehicles; that usually on curves of 300 foot radius and less and toward the right, the motor truck is driven partly on the outside or left hand side of the center line, leaving the rear portion of the semi-trailer on the right hand side of the pavement; that the said vehicles cannot go around corners on city streets of average width without blocking traffic in two or three directions and without getting on the wrong side of the street; that when the pavement is slippery from ice or rain said transports are difficult to control on account of their great length and are then dangerous to all other traffic; that when said transports are traveling empty at night it is practically impossible for a person approaching them to see what they are or how long they are, and vehicles attempting to pass sometimes collide because of not being able to tell the length of said transports; that said transports are a danger and hindrance to traffic at any speed.

at which they may be operated; that when they are driven slowly along pavements of 20 feet and less in width and travel on the road is heavy, they block traffic to a considerable degree, and when they travel at high rates of speed they are still more dangerous, as they cannot be properly controlled on account of their construction and length; that in snow said vehicles, on account of their construction, get stuck in drifts and block traffic more than do any other types of vehicles; that when two or more of said transports follow directly behind each other they occupy so much of the length of the road that they form a considerable hazard to other vehicles which may desire to pass ahead of said transports; that the operation of said transports has caused a number of serious accidents in the state during the last two years; that many other motor vehicles have been forced off of the pavement by reason of the fact that said transports occupied more than their half of the road."

So acute had become the evils and dangers arising out of the operation of the long and rigid tractor and semitrailer that a general public demand was made for a law limiting the length of such vehicles. Accordingly, House Bill No. 1199 was introduced in the Fifty-Seventh General Assembly of the State of Illinois amending certain sections of the Motor Vehicle Act and limiting the length of trucks and trailers and trucks and semitrailers, which was referred to an appropriate committee and by that committee referred to a subcommittee. Mr. Sheets, chief highway engineer, appeared before the subcommittee and advocated the principle of the proposed legislation. Among other things, Mr. Sheets stated to the subcommittee: "Regarding the length of vehicles, I must state that we are being besieged with complaints from all parts of the State about the length of trucks and trailers. We get hundreds of letters from our citizens wanting to know why the State allows these large lumbering freight trains to go over the highways jeopardizing public traffic and public safety. Of course, some of these complaints are radical and unwarranted, but in general the complaints represent a rather fair cross-section of public sentiment today." Mr. Sheets also said: "There is one vehicle now using our highways which is positively dangerous, and that is the tractor equipped with a long-semi-trailer used for transporting automobiles. Such a unit comes within the 65 foot limit, but on account of the long unbroken semi-trailer these vehicles are positively dangerous because of their inability to round curves without encroaching up-on the other traffic lane. Many serious accidents have resulted from such operation, and regardless of what may be done about the total length of train permitted under our laws, it is absolutely essential that some amendment be added to our present law which would make the limit of length for any single unit not over thirty-five feet."

As noted in the affidavit of Mr. Sheets, there are two types of motor vehicles using the public highways against which complaints had been made, namely, truck and semitrailer, and truck and trailer. A trailer is an independent transporting unit which is towed by another vehicle and the entire weight of which is carried on its own wheels. Under the Illinois law, effective until January 1, 1933, the combined length of trucks and trailers may be 65 feet; after that time, 40 feet.

There is a difference, as disclosed by the affidavits, between the two classes of vehicles. They are constructed upon entirely different principles and produce entirely different results.

Both types of vehicles, when operated on the public highways, produce evils and inconveniences. Both types, it would seem from the affidavits, in varying degrees, snake, whip, weave, jackknife; the length of the train makes it difficult for other automobiles to pass; they get stuck in snowdrifts and stall on the hills; they impede traffic; they do not stay in their own traffic lane.

The chief complaint made against the operation of the truck and semitrailer was directed to its tendency to encroach on the adjacent traffic lane at curves and street and highway intersections. The affidavits are in conflict as to the extent of encroachment of both types of vehicles. The defendant offers the affidavit of Walter G. Hagemeyer, a graduate civil engineer of the University of Illinois and for the last five years employed as an engineer and draftsman in the state highway department, in which he computes the positions which would necessarily be taken by vehicles of various types and dimensions in making curves on pavements of from 16 to 20 feet in width and constructed on radii from 100 to 300 feet. He has calculated the overhang of vehicles both of the semitrailer type and of the full trailer type. A glance at the summary of his calculations shows beyond dispute that the tendency of the long unit type of vehicles to invade the opposite traffic lane is far greater than exists in the case of separate units of equal over-all length and traveling together as a single unit. The overhang of a vehicle of the exact type and

dimensions used by the plaintiff—a tractor and 50 foot semitrailer with an over-all length of 60 feet—is shown by Mr. Hagemeyer's calculations as follows:

ordinary trucks of 35 feet or less in length or a combination of truck with a trailer or trailers coupled thereto of a total length of 65 feet, where each of the single vehicles in.

### 60 Foot Truck and Semi-Trailer.

| | | Outside Traffic Lane | Inside Traffic Lane |
|---|---|---|---|
| 18 ft. Pavement, | 100 ft. Radius | 4' – 6" | 4' – 1 1/2" |
| 20 ft. " | 100 ft. " | 4' – 0" | 3' – 1 1/2" |
| 16 ft. " | 200 ft. " | 2' – 4 1/2" | 2' – 6" |
| 18 ft. " | 200 ft. " | 1' – 10 1/2" | 1' – 6" |
| 20 ft. " | 200 ft. " | 1' – 4 1/2" | 0' – 6" |
| 16 ft. " | 300 ft. " | 1' – 6" | 1' – 9" |

His calculations as to the full trailer type consists of a motortruck and trailer coupled together, with an over-all length of 65 feet, are as follows:

the combination is less than 35 feet in length; that most of said trailers are so coupled to said trucks and so constructed that they follow the truck around the curve without get-

### 65 Foot Truck and Trailer.

| | | Outside Traffic Lane | Inside Traffic Lane |
|---|---|---|---|
| 18 ft. Pavement, | 100 ft. Radius | 3' – 2 1/2" | 2' – 1" |
| 20 ft. " | 100 ft. " | 2' – 8 1/2" | 1' – 1" |
| 16 ft. " | 200 ft. " | 1' – 10 1/2" | 1' – 5" |
| 18 ft. " | 200 ft. " | 1' – 4 1/2" | 0' – 5" |
| 20 ft. " | 200 ft. " | 0' – 10 1/2" | 0' – 0" |
| 16 ft. " | 300 ft. " | 1' – 3" | 1' – 0 1/2" |

The excess of the overhang of the semitrailer type over the full trailer combination upon the several pavements and radii may, therefore, be summarized as follows:

ting on the wrong side of the road; that a trailer of the same length as a semi-trailer, from the rear end to the coupling or connection, does not cut in on the opposite traffic

### Excess.

| | | Outside Traffic Lane | Inside Traffic Lane |
|---|---|---|---|
| 18 ft. Pavement, | 100 ft. Radius | 1' – 3 1/2" | 2' – 1/2" |
| 20 ft. " | 100 ft. " | 1' – 3 1/2" | 2' – 1/2" |
| 16 ft. " | 200 ft. " | 6" | 1' – 1" |
| 18 ft. " | 200 ft. " | 6" | 1' – 1" |
| 20 ft. " | 200 ft. " | 6" | 6" |
| 16 ft. " | 300 ft. " | 3" | 8 1/2" |

Here is a difference of from 3" to 2' 1/2" on different curves and pavement widths in favor of the combination permitted by the statute as compared with the kind of transports operated by plaintiff.

Mr. Sheets, in his affidavit, institutes a comparison between truck and semitrailer and truck and trailer on curves and says: "This affiant further states that the encroachment on the opposite traffic lane, as hereinabove stated, is not to the same extent for lane of the highway to the same extent as said semi-trailer, for the reason that the trailer is carried upon an axle with wheels underneath the front portion of the trailer and another axle with wheels underneath the rear portion thereof, while the semi-trailer is carried upon but an axle with wheels near the rear thereof and the front portion thereof being carried upon the rear platform of the truck or tractor, and there being a less longitudinal distance between the axles of the

trailer than between the rear axle of the truck or tractor and the axle supporting the semi-trailer at the rear portion thereof; that the greater the number of units in a combination vehicle of a given length and the less the distance between the axles of each unit and the distance between the coupling or connection of the units and the axle of each unit nearest the coupling or connection, and the more nearly that said distances are equal, the more closely the combination vehicle will pass around a curve on a highway and stay on its own traffic lane; that the sets of wheels of the combination vehicle of tractor and trailer are more equally spaced and the distance between the axles of the trailer is less than the distance between the rear tractor axle and semi-trailer of the tractor and semi-trailer combination, when the semi-trailer is the same length as the trailer from the rear end to the coupling or connection; that consequently the trailer of the same length as a semi-trailer as above mentioned follows the tractor around a curve more closely and keeps in its own traffic lane better than the semi-trailer; that said trailers do not whip from side to side on the highways beyond the lines traveled by the motor truck or tractor more than the semi-trailers of said automobile transports."

Corroborating and supporting the affidavit of Mr. Hagemeyer are the affidavits of Mr. Sheets and of sergeants of the state police force, state highway patrol officers, and citizens representing various lines of business and professional activities. The affidavits are to the general effect that vehicles of the type and length of those of the plaintiff cannot turn the ordinary curves on the public highway system without invading the other traffic lane, thereby seriously impeding traffic and interfering with other vehicles.

 *Due Process of Law.*—It is well settled by repeated decisions of the Supreme Court that, in the absence of national legislation, the states have the reserved police power to prohibit dangerous vehicles from operating on the public highways. Such legislation is supported by every consideration of public safety and convenience and does not violate the due process requirements of the Federal Constitution. Hendrick v. Maryland, 235 U. S. 622, 35 S. Ct. 140, 59 L. Ed. 385; Morris v. Duby, 274 U. S. 140, 47 S. Ct. 548, 71 L. Ed. 966; Kane v. New Jersey, 242 U. S. 160, 37 S. Ct. 30, 61 L. Ed. 222; Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596.

The latest expression of the Supreme Court on this subject is found in the case of Sproles v. Binford, 52 S. Ct. 581, 585, 76 L. Ed. ——, decided May 23, 1932, wherein the court say: "When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome."

On the same day the Supreme Court also handed down another opinion (Continental Baking Co. v. Woodring, 52 S. Ct. 595, 599, 76 L. Ed. ——), in which it held that the state may "regulate the use of its highways to promote the public safety."

*Equal Protection of the Laws.*—The point most strongly pressed is that the act in question denies to plaintiff the equal protection of the laws. This asserted inequality arises, so it is claimed, in three particulars. It is asserted:

(a) The provision of the act allowing and permitting until January 1, 1933, a combination of truck and trailer of an over-all length of 65 feet, arbitrarily and unreasonably discriminates against the use of a truck and semitrailer with a permissible length of only 35 feet.

(b) The provisions of the section exempting from the length limitations thereof poles, piling, beams, and other like structural units incapable of dismemberment and one unit of electrical equipment, renders the section void as discriminatory.

(c) The proviso to section 9 of the Illinois Motor Vehicle Act (Illinois Session Laws 1931, pages 795-797) reading, "That nothing in this Act shall be construed to include tractors, traction engines or other similar vehicles used exclusively in agricultural pursuits, or used by residents of this State in any kind of road work," creates an unfair discrimination.

 And, first, as to the claimed discrimination between tractor and semitrailer with a permissible maximum length of 35 feet and tractor and trailer with a permissible length of 65 feet: It may be conceded that both types of vehicles create evils and dangers upon the public highway. Both types of vehicles have the tendency to snake, jackknife, and weave. It is claimed, however, that vehicles of the semitrailer type and of the full trailer type are constructed on different principles, produce different evils in different degrees. They present different problems calling for different regulations. One evil, common to both, is to weave or

snake or jackknife while being driven at excessive speed upon the public highway. Another evil, common to both, is that of stalling on hills and thus impeding or obstructing traffic. The attention of the General Assembly was directed to the particular classes of evils and inconvenience growing out of the use of these two types of vehicles. Upon a study and consideration of these two types of vehicles, the General Assembly concluded that until January 1, 1933, it was inadvisable and inexpedient to reduce to maximum permitted length of trucks and trailers (the maximum length of which was fixed in 1919), but that it was wise and expedient immediately to limit the length of trucks and semitrailers to 35 feet. The study made by the General Assembly convinced that body that the particular evil and danger growing out of the use of trucks and semitrailers arose because of the tendency of such trucks and semitrailers unreasonably to invade the adjacent traffic lane. In accordance with the affidavits filed in this case, a showing was made to the General Assembly that the trucks and semitrailers on curves, at street intersections, and at highway intersections, seriously impeded traffic, forced vehicles on the adjacent traffic lane off the road, caused many accidents entailing not only damage to property, but serious personal injury and in some cases loss of life. The General Assembly further found that such dangers and evils on curves and street intersections did not inhere in the operation of trucks and trailers of the maximum length of 65 feet. The finding of the General Assembly is supported by a preponderance of the evidence before the court.

Comparing a truck and semitrailer with an over-all length of approximately 60 feet with a truck and trailer of the same over-all length turning a curve on an 18-foot pavement on a 100-foot radius, the truck and semitrailer invades the opposite traffic lane of from 1 to 2 feet more than do the truck and trailer. A difference of a foot in the width of a pavement is sometimes very vital in the operation of an automobile. The excess of overhang is set forth somewhat in detail in the statement of facts. The General Assembly of Illinois had the constitutional right and authority to direct its legislation against a class of vehicles producing in a special degree the particular evils sought to be eliminated.

■■ Any classification adopted by a state which has a reasonable basis, and is not palpably arbitrary and unreasonable, will be sustained against an attack based upon this clause of the Fourteenth Amendment; and every state of facts sufficient to sustain such classification which can be reasonably conceived of as having existed when the law was enacted, will be assumed. New York ex rel. Bryant v. Zimmerman, 278 U. S. 63, 73, 49 S. Ct. 61, 73 L. Ed. 184, 62 A. L. R. 785; Packard v. Banton, 264 U. S. 140, 144, 44 S. Ct. 257, 68 L. Ed. 596; State Board of Tax Com'rs v. Jackson, 283 U. S. 527, 537, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, 79, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Wampler v. Lecompte, 282 U. S. 172, 175, 51 S. Ct. 92, 75 L. Ed. 276; People v. Linde, 341 Ill. 269, 276, 173 N. E. 361, 72 A. L. R. 997; Sproles v. Binford (D. C.) 52 F.(2d) 730.

■ The Legislature may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses. Central Lumber Co. v. South Dakota, 226 U. S. 157, 33 S. Ct. 66, 57 L. Ed. 164; James, etc., Co. v. Harry, 273 U. S. 119, 47 S. Ct. 308, 71 L. Ed. 569.

In the case of Keokee Consol. Coke Co. v. Taylor, 234 U. S. 224, 34 S. Ct. 856, 857, 58 L. Ed. 1288, the court say: "But while there are differences of opinion as to the degree and kind of discrimination permitted by the 14th Amendment, it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see. That is for the legislature to judge unless the case is very clear."

Again in the case of New York ex rel. Bryant v. Zimmerman, 278 U. S. 63, 49 S. Ct. 61, 65, 73 L. Ed. 184, 62 A. L. R. 785, the court say: "A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. * * * The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' "

In the case of Sproles v. Binford, supra, the court say: "There is no constitutional requirement that regulation must reach every class to which it might be applied—that the

Legislature must regulate all or none. Silver v. Silver, 280 U. S. 117, 123, 50 S. Ct. 57, 74 L. Ed. 221. The state is not bound to cover the whole field of possible abuses. Patsone v. Pennsylvania, 232 U. S. 138, 144, 34 S. Ct. 281, 58 L. Ed. 539. The question is whether the classification adopted lacks a rational basis."

From the evidence before the court the General Assembly was amply justified in finding that there was a difference between the two types of vehicles and in their operation. In this difference is found the justification for legislative classification.

We cannot say that the classification made by the General Assembly is not made upon a reasonable basis. The section does not offend, in the particulars now under consideration, against the Federal Constitution in making an unreasonable discrimination between tractor and semitrailer and tractor and trailer.

We now come to the objection that discrimination is created by that part of the section exempting from the length limitations poles, piling, beams, and other like structural units incapable of dismemberment and one unit of electrical machinery. This objection is without merit. The units exempted from the length limitations are the subject only of occasional transportation and obviously form a class all to themselves. The exceptions are reasonable and necessary and not subject to the charge of unjust discrimination. Sproles v. Binford, supra.

Lastly, as to discrimination, it is claimed that by virtue of section 9 of the Motor Vehicle Act, vehicles used exclusively in agricultural pursuits or used by residents of this state in any kind of road work are exempt from the length limitation. Our attention has not been called to any authoritative decision of the courts of Illinois which gives the section the construction contended for. Section 9 pertains to licensing of automobiles. The uniform construction placed upon this section since its enactment in 1923 has been that it applies to fees and registration and not to length limitation. Taken in the context in which the words are used, it would be difficult, reasonably, to construe the section to exempt vehicles used in agricultural pursuits or used by residents of the state in road work from the length limitation prescribed by subsection 5 of section 3. The contention that section 9 creates a discrimination is wholly without merit.

*Burden on Interstate Commerce.*—The contention that the section of the Motor Vehicle Act now under consideration violates the Commerce Clause of the Federal Constitution, in that it imposes an unreasonable burden on interstate commerce, is conclusively answered by the case of Morris v. Duby, 274 U. S. 135, 47 S. Ct. 548, 550, 71 L. Ed. 966, wherein the court say: "An examination of the acts of Congress discloses no provision, express or implied, by which there is withheld from the state its ordinary police power to conserve the highways in the interest of the public and to prescribe such reasonable regulations for their use as may be wise to prevent injury and damage to them. In the absence of national legislation especially covering the subject of interstate commerce, the state may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens. Hendrick v. Maryland, 235 U. S. 610, 622, et seq., 35 S. Ct. 140, 59 L. Ed. 385; Kane v. New Jersey, 242 U. S. 160, 167, 37 S. Ct. 30, 61 L. Ed. 222."

The regulation before the court in that case had to do with the weight of motor vehicles and the loads thereon. If the state may regulate the weight of motor vehicles moving in interstate commerce, by a parity of reasoning, the state may, unless the regulation is arbitrary and unreasonable, regulate the length of motor vehicles. The holding in the case of Morris v. Duby, supra, is approved in the case of Sproles v. Binford, supra. As we have seen, the regulation prescribed by the General Assembly of Illinois in the section now under consideration is not unreasonable or arbitrary.

*Privileges and Immunities of Citizens.*— The contention that the plaintiff, a citizen and resident of Michigan, is denied the privileges and immunities of the citizens of the state of Illinois, is based upon that part of section 9 of the Motor Vehicle Act exempting from the operation of the act vehicles used in agricultural pursuits or used by residents of Illinois in any kind of road work. We have hereinabove expressed the view that section 9 relates only to fees and licensing and has no relation to the regulation of the length of motor vehicles. In view of our construction of section 9, there is no basis upon which the argument of plaintiff may be predicated.

*Delegation of Legislative Powers.*—The contention that the act contains an unauthorized delegation of legislative powers to highway and street officials is based upon that part of subsection 5 of section 3 which reads as follows: "Upon application the highway or

street officials having proper jurisdiction over a particular highway may grant special permits in writing for the operation of vehicles or combinations of vehicles and trailers or semitrailers exceeding the foregoing weights and dimensions. Such permits may be granted in the discretion of the highway or street officials when in their opinion an emergency exists warranting the granting of the permit. The permit shall be granted only for limited periods and for trips over designated highways and streets, at specified times and subject to such other conditions as such highway or street officials may prescribe, but in no case shall such permit exceed a period of ten days."

It is contended that the power vested in highway or street officials to grant special permits in case of an emergency vests in such officials legislative power. It is contended in the first place that the clause of the statute above quoted is vague and uncertain, in that it does not specify the highway or street officials who are vested with power to grant the permits. A consideration, however, of the statutory policy of the state with reference to the control and jurisdiction over public highways makes it clear that the applicable statutes delimit and define the highway officials having control of individual highways and streets. Space will not permit an analysis or detailed statement as to the particular highway officials having jurisdiction over particular designated highways, but practical experience over many years has not given rise to any serious question of jurisdiction. It is also contended that the statute is vague and uncertain, in that it does not define an emergency. The word "emergency" is used in its plain, ordinary signification and, as defined by the lexicographers, means or implies a pressing necessity; an unforeseen occurrence or combination of circumstances which calls for immediate action or remedy. City of Chicago v. Marriotto, 332 Ill. 44, 163 N. E. 369, 60 A. L. R. 501.

The question then remains: Does that portion of section 5 last above quoted delegate legislative power to highway officials? We think that the power to grant permits in emergencies would not invalidate the statute. The reasoning of the Supreme Court of the State of Illinois in the case of City of Chicago v. Marriotto, 332 Ill. 44, 163 N. E. 369, 60 A. L. R. 501, involving the validity of a city ordinance vesting in police traffic officers the right to direct traffic "in emergencies as public safety or convenience may require," appeals to us as being valid.

Among other things, the court say: "Appellant complains that the ordinance contains no definition of or direction as to when an emergency exists; that an officer is left to exercise his own judgment on the existence of an emergency; and that traffic blockades are not included within the meaning of the word 'emergency.' It would be almost impossible to state in an ordinance or law every condition or set of circumstances wherefrom an emergency might be said to arise or exist."

No law can cover all possible situations. A large measure of discretion and judgment must be left to those charged with executive and administrative duties. The statute indicates the general policy of the government and has left to the administrative officers, within narrow limits, to administer the details so as to make the law practically effective. Sproles v. Binford, supra.

We are of the opinion that the act of the General Assembly is not unconstitutional.

The preliminary injunction heretofore issued will be dissolved and an order may be entered dismissing the bill for want of equity.