In re CHICAGO & N. W. RY. CO. (eighteen cases).

Nos. 7561–7569, 7724, 7767–7772, 7740, 7741.

Circuit Court of Appeals, Seventh Circuit.
Feb. 9, 1942.

Affirming decree 35 F.Supp. 230.

Luther M. Walter and Helen W. Munsert, both of Chicago, Ill., Robert K. Stuart, of Evanston, Ill., Ferris E. Hurd, of Chicago, Ill., Edward K. Hanlon, of New York City, Meyer Abrams, Norman Asher, Edward C. Kohlsaat, and Harry N. Wyatt, all of Chicago, Ill., John M. MacGregor, of New York City, R. C. Stevenson, of Chicago, Ill., John B. Marsh and Edward E. Watts, Jr., both of New York City, Walter H. Jacobs and Anthony L. Michel, both of Chicago, Ill., S. Pierce Browning, Jr., and Robert E. Houston, Jr., both of New York City, Anan Raymond, Robert Z. Hickman, Cyrus H. Adams, and James P. Dillie, all of Chicago, Ill., and Orrin G. Judd, of New York City, for appellants.

Kenneth F. Burgess, Douglas F. Smith, and Geo. Ragland, Jr., all of Chicago, Ill., McCready Sykes and Wm. A. Stewart, both of New York City, Wm. B. Hale, of Chicago, Ill., Fred N. Oliver and Willard P. Scott, both of New York City, Chas. M. Thomson, of Chicago, Ill., Edwin S. S. Sunderland, Thos. O'G. FitzGibbon, and Geo. John Miller, all of New York City, Henry F. Tenney, Roger R. Leech, and Lee Walker, all of Chicago, Ill., Russell L. Snodgrass, Cassius M. Clay, A. Marvin Braverman, and James W. Close, all of Washington, D. C., Herbert Friedlich, of Chicago, Ill., Leonard D. Adkins and Alfred H. Phillips, both of New York City, and Wm. D. Kerr, of Chicago, Ill., for appellees.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

These eighteen appeals [1] arise out of the reorganization proceedings of the Chicago

---

[1] The orders appealed from are: (1) The order of October 12, 1940, approving the plan; (2) the order of June 27, 1941, confirming the plan; (3) The order overruling the Debtor's motion to refer the cause back to the I. C. C. for the fixing of values; (4) the order refusing the "State Line" motion to impound income and to make interest payments, and (5) the orders directing the Debtor's trustee to make interest payments to security holders in accordance with provisions of the plan. Seriatim, the appeals are:
Appellants:

Debtor Railway:
- No. 7561—from order approving plan
- No. 7562—from order denying motion to refer back to I. C. C.
- No. 7724—from order confirming plan

Convertible Bondholders:
- No. 7563—from order approving plan
- No. 7767—from order of confirmation

Protective Com. Common:
- No. 7564—order approving plan
- No. 7768—order confirming plan

Protective Com. Pfd.:
- No. 7565—order approving plan
- No. 7771—order confirming plan

City Bank, Trustee, Refunding Mtg.:
- No. 7566—order approving plan
- No. 7770—order confirming plan

Bank of N. Y., Trustee, Sparta Mtg.:
- No. 7567—order approving plan
- No. 7772—order confirming plan

Irving Trust Co., Trustee, State Line:
- No. 7568—order approving plan and fixing allowance; No. 7569, order on motion to impound income and to obtain interest
- No. 7769—order confirming plan

Debtor Ry.: (No. 7740, 7741, appeals from order directing Debtor's trustee to make interest payments to security holders in accordance with provisions of plan.)
Appellees: Life Ins. and Mutual Savings Group; Chemical Bank, Trustee; Peoria Mtg.; DesPlaines issue, trustee; U. S. Trust Co., Trustee; General Mortgage; Charles M. Thomson, Debtor's Trustee; Committee for holders of Collateral Notes; Sioux City Issue, Trustee.

& North Western Railway Company, instituted pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Interstate Commerce Commission's plan of reorganization has been accepted, with one exception, by more than two-thirds of the creditors, of each of the groups, who voted on the reorganization plan, and it has been confirmed by the District Court, after full hearing. We have the benefit of the District Court's findings and opinion, In re Chicago & N. W. Ry. Co., D.C., 35 F.Supp. 230, and an elaborate and informative report by the Examiner of the I. C. C., as well as a complete discussion and ultimate findings by the Commission.[2] The appeals are chiefly from the trial court's orders of approval and confirmation of the plan of reorganization.

The Debtor operates in nine states, over 8,290.533 miles first main track and 13,047.-127 of all tracks.[3] A subsidiary of the Debtor, the Chicago, St. Paul, Minneapolis & Omaha Railway Company, owns 1,577.171

---

[2] There was one concurring opinion, and one dissenting opinion. Two commissioners took no part in the disposition of the case.

[3] The Report of the Examiner gives these essential facts concerning the Debtor Railway:

"The * * * North Western Railway system comprises two principal companies, the * * * * North Western * * * and the Omaha, with other subsidiary companies and leased lines. * * *

"The lines of the debtor and its subsidiary, the Omaha, serve the important industrial * * * sections * * * of the west. * * * Traffic density on primary lines is comparatively heavy.

"A double track line, extending from Chicago to Omaha, * * * forms a part of the through transcontinental routes * * * A 4-track line of heavy traffic density is operated between Chicago and Milwaukee; * * Passenger business is an important part of the total.

"The lines of the debtor and the Omaha are supplementary and complementary. The dependency of the Omaha upon the debtor is as great or greater than that of the debtor upon the Omaha.

"Capitalizable assets of the system as of December 31, 1937, according to the principles laid down in * * * [In re Missouri Pacific Railroad Company Bonds], 180 I. C. C. 352, as shown in the balance sheet, included investments in road and equipment, * * * of $551,-452,912 * * * investments in affiliated companies * * * of $4,421,829, and working capital * * * in the amount of $17,928,220. The total of $587,866,-358 does not necessarily represent present day values. * * * The reports show * * * the cost of reproduction less depreciation of the road and equipment of the * * * North Western * * * other than lands and rights, was $479,611,489, that the value of lands and rights was $104,171,605, and the amount of working capital was $6,731,000; that the cost of reproduction less depreciation of the road and equipment of the Omaha, other than lands and rights, was $75,031,-987, that the value of lands and rights was $9,041,124, and that the amount of working capital was $1,044,900 * * *.

"In the year 1937, * * * North Western * * * carried 40,654,979 tons of revenue freight. * * * Rail-line revenues assignable to freight service were 81 percent of total rail-line transportation revenues, and revenues assignable to passenger and allied services 19 per cent. Of the total freight tonnage carried in 1937, about 25 per cent was local to the company's lines and about 8 per cent was bridge traffic.

"In the year 1937, * * * Omaha * * * Company carried 8,928,778 tons of revenue freight * * *. The average revenue per ton was $1.71 and the average length of haul 169.40 miles.

"For the 5-year period 1926-1930, annual freight revenues as shown by the books of account of * * * North Western * * * average $107,586,057, and total railway operating revenues $148,-264,372. Net railway operating income averaged $21,886,303, nonoperating income averaged $3,675,666, and income available for interest averaged $25,448,-468. Net income after fixed charges averaged $11,669,148. * * * During the 5-year period 1931 to 1935, annual freight revenues of * * * North Western * * * averaged $60,983,658; and total railway operating revenues $80,279,055. Net railway operating income averaged $4,501,455, nonoperating income, $3,571,-017, and income available for interest was $7,966,232. Income available for interest was $10,390,649 in 1931, $5,665,558 in

miles of first main track and 2,438.047 miles of all tracks. It is operated and renders reports separately from Debtor but its lines complement those of Debtor.

The Debtor's obligations, generally, comprehended seven divisional mortgages, two system mortgages, R. F. C., R. C. C., and bank loans, equipment trust obligations, and other miscellaneous indebtedness.

To give a succinct idea of the basic facts of this reorganization and the Debtor's financial structure, this chart is appended:

1932, $9,401,214 in 1933, $8,485,752 in 1934, and $5,887,990 in 1935. The account for net income after charges showed an average deficit of $8,894,581. * * *

"For the 5-year period 1926 to 1930, annual railway operating revenues of * * * Omaha Railway * * * averaged $26,393,543 and income available for interest $2,626,141. The account for net income after charges showed an average deficit of $74,913. For the 5-year period 1931-1935 annual railway operating revenues of the Omaha averaged $15,643,122; and income available for interest $576,197. The account for net income after charges showed an average deficit of $2,178,364.

"* * * North Western * * * railway operating revenues totaled $91,969,298 in 1936 and $89,802,536 in 1937. Income available for fixed charges totaled $7,028,492 in 1936 and $1,891,408 in 1937. For the Omaha * * * railway operating revenues totaled $18,328,050 in 1936 and $18,178,115 in 1937. Income available for fixed charges totaled $489,557 in 1936, and in 1937 * * * a deficit before fixed charges of $113,297. The consolidated account for the system shows a total of $110,297,348 of railway operating revenues in 1936 and $107,980,651 received in 1937. The system account for income available for fixed charges shows $7,358,655 received in 1936 and $1,624,213 received in 1937.

"Four estimates of normal future earnings were presented, two by the debtor, one by the savings bank group committee, and one by the insurance group committee. * * * A very extensive survey of traffic trends and prospects was made; and conditions affecting all the principal commodities were examined separately. Considering the nature of the problem, all estimates are in substantial agreement as to prospective freight revenue tonnage * * * the highest estimate being 50,409,000 tons * * * and the lowest, 47,422,000 * * *

"The debtor's president also testified at length on the prospects of the property. He was apparently in general agreement * * * on the question of probable freight tonnage * * *. The record points very strongly to the conclusion that the plan of reorganization should be based on a probable prospective normal freight tonnage differing little if any from the 49,423,000 tons forecast by the officers of the traffic department. * * *

"* * * Hand believes that one-third of the 1930 volume (of traffic) has been lost permanently to truck competition. Thus approximately the 1930 ton-mile earnings would be restored with no increase in freight rates. This is a sweeping conclusion, but entitled to careful consideration because of the long experience of the witness. * * * Since 1926 there has been a heavy loss of high-rated merchandise traffic to truck competition, which the debtor does not expect to regain.

"In the case of passenger revenues, the traffic officer's forecast is for $16,531,000, the insurance group's for $14,200,000 and the savings bank group's for $14,000,000. Hand's estimate is for $22,575,000 * * With the increased use of highways by private automobiles and passenger busses, Hand's estimate appears unlikely to be realized for many years to come, if at all.

"For operating expenses of the normal future years, * * * the life insurance group estimates $91,162,000, the savings bank group $87,850,000 and the debtor's department officers $89,700,000.

"With respect to net railway operating income, after considering taxes and equipment and joint facility rents, the department officers estimated that $9,730,800 would be received in the normal future year * * * the insurance group $7,313,000; and the savings bank group $6,642,000. Hand estimates $29,520,500.

"On a system basis, the combined income of the Chicago North Western and the Omaha available for fixed charges is thus indicated by the department officers' estimate as $11,404,729; by the insurance group's estimate as $14,625,000; and by the savings bank group's estimate as $13,390,000. The Commission's plan of reorganization should be based accordingly on a normal expectancy of income available for fixed charges produced by the two properties of not to exceed $14,625,000 for some $3,220,271 of which an extensive improvement of facilities and operating methods must be looked to. * * *."

| Name of Security or Obligation | A. Issued B. Matured C. Interest Rate D. Interest Unpaid | A. Amount Issued B. Amount Outstanding | Lien On | What Commission Gave to Holders | | | | | A. Original Cost of Property excluding equipment | A. Percent of Holders Voting B. Percent of Those Voting in Favor of Plan |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fixed Interest Bonds | First & Gen. Mtg. Bonds 4% 2⅜% Fixed 1½% Contingent | Second Mtg. Convertible Income Bonds, Series A, 4½% | Preferred Stock | Common Stock | | |
| General Mortgage (5 series) | B. 1987 C. 3½, 4, 4½, 4¾, 5% | B. $132,011,500 as follows: $31,315,000—3½% 30,552,000—4% 5,789,500—4½% 23,661,000—4¾% 40,694,000—5% also $23,896,000 pledged ($174,037,872 prin. & interest) | 4,876.1 miles wholly owned and 15.1 jointly owned track. (Lines east of Mo. River). 114 Steam locomotives 1,639 freight cars 104 passenger cars 40 units work equipment | | 17.6% $6,200,508 6,171,908 1,187,155 4,898,241 8,464,560 | 41% $14,499,308 14,360,380 2,768,098 11,381,903 10,737,075 | 37.8% $13,371,932 13,260,436 2,548,040 10,506,372 18,190,665 | 3.6% $1,252,640 1,252,714 243,222 993,846 1,749,885 | A. 326,335,801 including equipment B. 359,264,801 including 84,883,950 lands and rights. | B. 96.06% |
| Fifteen Year Bonds | B. 1936 C. 6½% | B. $14,775,000 | Secured by pledge of $17,730,000 gen. mtg. 5% Series E Bonds of 1987 | | 20% $250 per thousand $3,693,750 | 46% $582 $8,599,050 | 43% $537 $7,934,175 | 4.1% .51 $753,525 | | B. 98.43% |
| First and Refunding Mortgage (8 issues) | B. 2037 C. 4½% 5% | B. $47,822,000 as follows: $15,250,000—5% 20,572,000—4½% 12,000,000—4¾% Also $65,615,000 pledged ($55,806,578 prin. and int. due Dec. 1938). | 2,749.8 miles (lines west of Mo. River) and 1.3 miles jointly owned. 8 steam locomotives 3 other locomotives 4,473 freight cars 18 passenger cars 744 units work equipment. Also a junior lien on property on which gen. mtg. and divisional mtgs. are first lien. | | 13.1% (4½s) $152 (4½s) $4,950,944 $154 (5s) $2,348,500 $159 (6s) | 19.8% $230 $7,491,560 $233 $3,553,250 $241 | 26% $302 $9,836,744 $304 $4,681,750 $316 | 41.1% (for each thousand) 4.77 (for each thousand) $15,536,844 $4.85 (for each thousand) $7,396,250 $4.99 (for each thousand) | A. $103,806,572 including equipment B. $100,985,498 including $15,094,384 in lands | B. 97.75% |
| Collateral Notes to P. W. A. (2 issues) | B. 1937 (one issue) C. 4% | B. 1,360,000 as follows: 1,190,000 170,000 (reduced to 1,020,000 as of Jan., 1939) | Secured by 1,350,000 first mtg. bonds and $50,000 Cap. Stock of Escanaba Co. | Unchanged | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Twenty Year Series A Bonds (Convertible) | A. Nov. 1, 1929 B. 1949 C. 4½% D. Prin. and unpaid int. to date of plan, $86,651,302 | B. $72,335,000 | Unsecured | | | | 458,603 shares $45,860,300 | B. 87.10% |
| Equipment Obligations | | B. $14,973,000 also 117,000 pledged (Dec. 31, 1937) Reduced to 11,678,000 Dec. 31, 1938 | First lien on equipment, acquired between 1923–37, costing $63,414,791 and in better than 55% condition | Unchanged | | | | |
| Notes to R. F. C. | B. 1935, 1936 | B. 14,947,200 27,302,933 ($49,184,905 prin. and unpd. int. to Dec. 31, '38) | Collateral total 101,813,800 Gen.: 1,976,000 Refunding: 47,676,000 Equipment Cert.: 117,000 Omaha First 45,186,000 Omaha Equip. 144,000 Union Pac. Co. Pfd. 2,085,000 N. Y. C. bonds 64,000 Hudson bonds 100,000 Ind. Harbor bonds 1,520,000 Sioux City Co. 945,800 Superior Co. 2,000,000 | $25,000,000—15 yr. secured note | $7,783,180 | $12,114,530 | $15,543,462 | $23,259,836 |
| Bank demand notes | B. 1936 C. 5% | B. 4,439,690 ($5,029,948 prin. and unpd. int. as of Dec. 31, 1938) | Collateral: Gen. Mtg. 4,190,000 Refunding 16,108,000 Union Pac. Co. pfd. stock 2,085,000 Total $18,103,000 | $1,733,948 cash or equivalent (estimated proceeds of pledged U. P. R. Co. Stock) $3,296,000 15-yr. secured serial notes | | | | |
| Rfd. Credit Corp. notes | B. 1935, 1936 | B. 653,081 ($563,486 as of Dec. 31, 1938) | Collateral totalling $7,021,000 Refunding $6,021,000 Omaha First Mtg. bonds 1,000,000 and other provisions | To be given $663,000 4% 10-yr. serial notes | | | | |
| Temporary Demand Loan from Sioux City Bridge Co. | | B. 518,961 | Unsecured | | | | | $329,021 |

358

| Name of Security or Obligation | A. Issued / B. Matured / C. Interest Rate / D. Interest Unpaid | A. Amount Issued / B. Amount Outstanding | Lien On | Fixed Interest Bonds | First & Gen. Mtg. Bonds 2½% Fixed Int. 1½% Contingent Int. | Second Mtg. Convertible Income Bonds Series A, 4½% | Preferred Stock | Common Stock | A. Original Cost of Property Exclusive Equipment / B. Reproduction Cost Less Depreciation | A. Percent of Holders Voting / B. Percent of Those Voting in Favor of Plan |
|---|---|---|---|---|---|---|---|---|---|---|
| Preferred Stock | | B. $22,395,000 | | held to have no equity | | | | | | |
| Common Stock | | B. $158,440,300 | | held to have no equity | | | | | | |
| Milwaukee & State Line First Mtg. | A. 1/2/'06 B. 1941 C. 3½% | B. $2,500,000 ($2,350,000 prin. and interest due Dec., 1938) | 51 miles double track main freight line between Chicago and Milwaukee | | 27.3% $311 per thousand $777,500 | 39% $445 per thousand $1,112,500 | 33.7% $384. $960,000 | | A. $3,870,817 B. 3,574,820 | B. 50.37% |
| Manitowoc, Green Bay & N. W. First Mtg. | B. 1941 C. 3½% | B. $3,750,000 ($4,275,000 prin. and int. due Dec., 1938) | 113.5 miles in Wisconsin | | 32.9% $375. per thousand $1,406,250 | 35% $399 $1,406,250 | 32.1% $366 $1,372,500 | | A. 4,673,102 B. 4,278,949 | B. 100% |
| St. Paul East. Grand Trunk First Mtg. | B. 1947 C. 4½% | B. $1,120,000 ($1,321,600 prin. and int. due Dec., 1938) | 56.1—Oconto to Clintonville, Wis. (half abandoned) | | | | | 100% $11.80 (for each Thousand) $1,321,600 | A. 1,212,352 B. 1,161,111 | B. 83.7% |
| Milwaukee, Sparta & N.W. First Mtg. | A. 3/1/12 B. 1947 C. 4% | B. $15,000,000 ($17,300,100 prin. and int. due, Dec., 1938) | 177.3 miles—Belton, Wisconsin & Sparta, Wis. | | 20.8% $240 $3,660,000 | 23.5% 271 (per thousand) $4,005,000 | 28.6% 330. $4,950,000 | 27.1% 3 12 shares $4,080,000 | A. $15,405,431 B. 15,346,864 | B. 98.28% |
| Des Plaines Valley First Mtg. | B. 1947 C. 4½% | B. 2,500,000 | 19.7 miles double track and 25 steam locomotives. | 100% fixed int. 4% new divisional bonds, Jan. '60. Int. in cash at 4½ to Jan. 1, '30, thereafter at 4%. | | | | | A. 2,921,237 (including equipment) B. 2,884,955 | B. 98.66% |
| St. Louis, Peoria, N. W. First Mtg. | B. 1945 C. 5% | B. 10,000,000 ($12,000,000 prin. and int. due Dec. 1938.) | 112 miles 20 steam locomotives, 998 freight cars (Kickapoo Junction, Ill. to Benld, Ill.) carry Co. coal. | | 35.7% $428 $4,280,000 | 32.3% $388 per thousand $3,880,000 | 32% 384 $3,840,000 | | A. 10,787,260 (including equipment) B. 9,863,745 | B. 99.5% |
| Sioux City & Pac. First Mtg. | B. 1986 C. 3½% | B. 4,000,000 | 118.2 miles (Sioux City, Ia., to Freemont, Nebr.) | 100% fixed 4% int. new divisional bonds, Jan. '69. Int. to be pd. in cash to Jan. 1, '30. | | | | | A. 4,032,716 B. 5,960,031 | B. 100% |
| Chicago, St. Paul, Minn. & Omaha Bonds, ($46,186,000 all pledged to R.F.C. & R.C.C.). Equipment obligations | Bonds lien on entire Omaha Rd. | B. 353,000 equipment acquired between 1928-31, costing $3,167,280 | | | | | | | | |
| Preferred stock | | 789,700 | | | | | | | | |
| Common | | 1,100,300 | | | | | | | | |
| Oshkosh Transportation Co. Common stock. | | 70,000 | | | | | | | | |

The following is a brief description of the securities involved in this reorganization:

Milwaukee & State Line bonds, 3½% bonds of 1941, $2,500,000, a lien on 51 miles of double track main freight line between Chicago and Milwaukee, original cost of which was $3,870,817, and reproduction value of $3,574,820.

Manitowoc, Green Bay & North Western Ry., first mortgage, 3½% bonds of 1941, amounting to $3,750,000, a first lien on 113.5 miles of railroad in Wisconsin; original cost, $4,673,102, reproduction cost $4,278,949.

St. Paul Eastern Grand Trunk Railway first mortgage, 4½% bonds of 1947, amounting to $1,120,000, first lien on 56.1 miles of track in Wisconsin, original cost, $1,212,352, reproduction cost, $1,161,111.

Milwaukee, Sparta & North Western first mortgage, 4% bonds of 1947, amounting to $15,000,000, are a first lien on 177.3 miles of track in Wisconsin; original cost of $15,405,431, and cost of reproduction new, $15,348,864.

DesPlaines Valley Railway first mortgage, 4½% bonds of 1947, amounting to $2,500,000, are a first lien on 19.7 miles of double track, and some equipment; the original cost was $2,921,237, and the cost of reproduction new, $2,884,955.

St. Louis, Peoria & North Western Ry. first mortgage, 5% bonds of 1945, amounting to $10,000,000, a first lien on 112 miles of track and equipment; the original cost was $10,787,269, and reproduction cost, $9,803,745.

Sioux City & Pacific Rd. first mortgage, 3½% bonds matured 1936, amounting to $4,000,000, are a first lien on 118.2 miles of road, costing $4,932,716, and reproduction cost of $5,960,031.

The general mortgage bonds (varying from 3½ to 5%), amounting to $132,011,500 outstanding, and $23,896,000 pledged (total of $155,907,500) a first lien on 4,876.1 miles of road and equipment. The original cost was $326,335,801, and the cost of reproduction, $359,264,801.

The First and Refunding Mortgage (4½-5%, 2037) amounting to $47,822,000 outstanding, and $65,615,000 pledged (total of $113,437,000) a first lien on 2,749.8 miles of road, and some equipment. The original cost was $103,806,572, and the cost of reproduction was $100,935,498.

Equipment obligations of $14,973,000 are outstanding, and an additional $117,000 pledged, and are first liens on equipment costing $63,414,791.

Serial Collateral Notes, 4%, to Public Works Administration, amounting to $1,360,000, secured by $1,350,000 first mortgage bonds, and $50,000 capital stock of the Escanaba Co.

The 15-yr., 6½% bonds, matured in 1936, amounting to $14,775,000, secured by pledge of $17,730,000 of general mortgage 5% series E bonds of 1987.

The R. F. C. notes, maturing in 1936, amounting to $14,947,200, are secured by $101,813,800 principal amount of various debtor and other securities. Other notes to the R. F. C. which matured in 1935 and 1936 amounted to $27,302,933.

Bank Notes, 5%, matured in 1936, amounting to $4,439,690, were secured by $18,193,000 of principal amount of Debtor's securities.

Railroad Credit Corporation notes, maturing in 1935 and 1936, amounting to $653,681, were secured by $7,021,000 principal amount of Debtor's securities.

Twenty-Year convertible 4¾% Series A, bonds of 1949, amounting to $72,335,000, issued in 1929.

The preferred stock of Debtor, amounting to $22,395,000, and the common stock, amounting to $158,440,300.

The financial structure of Debtor is vexatiously involved. Its obligations, including interest, total $615,742,758. [4] (Unpaid interest to January 1, 1939, amounted to $59,156,409—of which $1,160,916 has since been paid.) Its cost of reproduction new, less depreciation, plus land values, is $676,793,588. A valuation, based on earnings (including earnings of the Chicago, St. Paul, Minneapolis & Omaha Ry. Co.) capitalized at five percent, for the period 1926-1930, is $508,969,360; for the period 1931-1935, it is $159,324,640. The I. C. C. believed (and so found) the earnings for the normal prospective year to be $14,625,000.

---

[4] Raised to $705,153,992 by substitution of obligations of debtor for secured notes in default.

The confirmed plan of reorganization provided for a $450,000,000 capital structure comprehending:

$117,000,000 fixed interest debt
105,000,000 contingent interest debt
107,000,000 preferred stock
121,000,000 common stock.

This would result in $3,382,079 fixed interest charges and $9,046,324 contingent interest charges—an annual total of $12,428,403. The I. C. C. held[5] there was no equity for the present common and preferred stockholders.

In brief, the confirmed plan of capital structure provides for: (1) undisturbed status of P. W. A. and Equipment obligations; (2) new divisional mortgages for the "Des Plaines" and "Sioux City" lines, at 100% and accrued interest, but the interest rate of the former to be decreased from 4½ to 4% and of the latter to be increased from 3½ to 4%; (3) issuance of new First and General Mortgage 4% bonds on the system with 2½% fixed and 1½% contingent commuted interest, and the issuance of a Second Mortgage Convertible 4½% income bonds; (4) issuance of new preferred and common stock.

These securities—the new general mortgage, the second mortgage, the preferred and common stock, were apportioned in varying percentages to the respective security holders.

There are three vital, determinative questions (and numerous less important questions) presented by this appeal.

(a) The finding, and the sufficiency of the evidence to support it, that the common and preferred stock of the old company are without value.

(b) The sufficiency of the evidence to support the finding that the estimated future normal income of the Debtor will not exceed $14,625,000 and will not support a capitalization, on reorganization, in excess of $450,000,000.

(c) The effect of the favorable vote of the creditors upon the objections advanced by mortgage trustees and others to the plan, and the alleged failure of the Commission to make necessary specific findings of values, which are required by the opinion in the case of Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

Other questions, but not so sharply pronounced in this case, as in the recent case of Chicago, Milwaukee & St. Paul Ry. reorganization, In re Chicago, M., St. P. & P. R. Co., 7 Cir., 124 F.2d 754, decided December 4, 1941, are: (a) The attacks on the fairness of the allocation of the securities among the various groups of lien holders. (b) The alleged preference shown the R. F. C. in the plan of reorganization. (c) The position of the so-called State Line Bonds,[6] and the finding of the District Court as to the fairness of the plan as to these bondholders. (d) A consideration of the wisdom of selling the assets back of this mortgage.

■ In our approach to the approval (or rejection) of the plan which the I. C. C. has submitted, and which bears evidence of much study and thoughtful consideration of a mass of facts and figures, by this body, which is peculiarly well qualified to analyze and digest said statistics, we have assumed to occupy the role of guardian and umpire. We act as umpire or arbitrator so far as the sharply conflicting claims of different groups of bondholders are concerned. And

---

[5] The permissible capitalization is thus insufficient to provide for satisfaction of all creditors' claims in full. From a consideration of the entire record, including the elements of value referred to, the earnings and prospective earnings, and especially the impairment in earning power of the properties, we conclude and find that this result cannot be avoided, and that the equities of both classes of stockholders have no value. From 1931 through 1938, the earnings have been, and contemplated earnings will be, wholly insufficient to pay interest stipulated for the outstanding bonds and other indebtedness.

All the commissioners subscribing to this report and order are deeply sympathetic with an attempt to find some method by which the present stockholders might be lawfully afforded a continuing interest in this property, whether in the way of subscription warrants or a subordinate class of common stock, despite the necessitous condition of the debtor requiring early and drastic reorganization. We reluctantly express the view that this is here impossible, for the law as it stands is inexorably against such a course.

[6] The holders of this group of bonds voted only 50.37% in favor of the plan.

we assume to act as guardians or trustees for the thousands of small security holders who, because their claims are small, could not be expected or required to go to Washington to present their claims, and protect them before the I. C. C., against the urge of groups which, before the I. C. C. and now before this Court, have insistently advanced and pressed their arguments in favor of larger allowances to their group members and smaller and less desired allocations to others.

It is unfortunate that this court may not have the benefit of advice of counsel appointed by it and representing all the interested parties,—the secured and unsecured creditors, the stockholders, and the public. As the law stands, counsel are limited in the scope of their employment.

True, we have had the advantage of helpful briefs by attorneys representing a large group of holders of bonds of different kinds, who have taken a broader view than could be expected from one who was employed to press the claims of a single group only. We are duly appreciative of this assistance. For, in a case where the assets are fixed in amount and not sufficient to pay all the secured creditors in full, the urge for a greater allowance to one must, necessarily, be at the expense of the allowance to another. In other words the sum of all claims—a, b, c, d, e, and f, etc., is X. Inasmuch as X is a fixed and unchangeable quantity, we cannot increase the amount represented by "a" without reducing the amount represented by one or more of the other elements, b, c, d, e or f. It thus becomes apparent that before beginning our study of the details of the plan, we must ascertain and fix the amount represented by X. Dispute over it is at the bottom of all other conflicts.

Common and Preferred Stock. In as much as the outstanding obligations exceed $450,000,000, it follows that there is no equity for the holders of the old stock.

Unless the $450,000,000 figure can be raised, the common and preferred stockholders must be eliminated.

Vulnerability of the Commission's figures must be limited to its finding that the probable income for the future normal year is $14,625,000. The importance of this link in the Commission's finding seems to be fully appreciated by that body, for we have been benefited with compilations of charts and earnings which run the gamut of possibilities.

The following statement is made, of the earnings of the company for 1930-1940—

| | | |
|---|---|---|
| 1930 | ............... | $22,837,630 |
| 1931 | ............... | 7,614,983 |
| 1932 | ............... | 2,384,574 |
| 1933 | ............... | 9,412,771 |
| 1934 | ............... | 8,356,854 |
| 1935 | ............... | 5,524,417 |
| 1936 | ............... | 9,060,616 |
| 1937 | ............... | 153,007 (deficit) |
| 1938 | ............... | 1,053,247 |
| 1939 | ............... | 7,701,603 |
| 1940 | ............... | 11,675,027 |

Likewise, we have the earnings from 1913 to 1923, which are:

| | | |
|---|---|---|
| 1913 | ............... | $20,382,666 |
| 1914 | ............... | 19,108,281 |
| 1915 | ............... | 19,393,742 |
| 1916 | ............... | 27,714,458 |
| 1917 | ............... | 23,762,324 |
| 1918 | ............... | 12,441,437 |
| 1919 | ............... | 12,678,750 (deficit) |
| 1920 | ............... | 1,609,231 |
| 1921 | ............... | 6,651,136 |
| 1922 | ............... | 17,036,306 |
| 1923 | ............... | 15,843,375 |

Likewise, there are many facts and statistics showing the change from 1920 to 1930 and more particularly from 1930 to 1940. To illustrate, the following tables are submitted:

Debt Outstanding Inclusive Short Term Notes But Not The Collateral Pledged Thereunder.

| | |
|---|---|
| December 31, 1919......... | $223,150,000 |
| December 31, 1929......... | 351,646,400 |
| July 1, 1935................. | 384,963,420 |
| December 31, 1938......... | 431,390,104 |
| December 31, 1941......... | 469,518,043 |

*Increase in Debt*—$246,368,043, or 110.40%

Freight Traffic, Ton Miles.

(Thousands)

| | |
|---|---|
| 1920 | 9,582,620 |
| 1929 | 8,902,865 |
| 1935 | 4,994,324 |
| 1938 | 5,200,389 |
| 1939 | 5,793,766 |

*Decrease in Freight Traffic*—3,788,854 or 39.62%

Passenger Traffic (Passengers Carried One Mile).

(Thousands)

| Year | |
|------|------|
| 1920 | 1,444,559 |
| 1929 | 953,462 |
| 1935 | 554,209 |
| 1938 | 684,877 |
| 1939 | 696,071 |

*Decrease in Passenger Traffic*—748,488, or 51.81%

The Commission found that the earnings of the normal prospective year are $14,625,000. The approved plan provided for fixed interest obligations of $3,382,079, as follows:

The tables and charts which have been submitted in abundance, to show the income, estimated and required, the revenue trends, etc., are informative, but need not all be set forth. A study of them justifies the following conclusions:

The indebtedness of the debtor increased more than 110% in twenty-two years, 1919 to 1941.

The freight traffic decreased 39% in twenty years, 1920 to 1940.

The passenger traffic declined 51% during the same period.

There have been large annual deficiencies for more than a decade.

Had the debtor's income available for interest (without payment of any Federal

| Fixed interest obligations | Principal | Fixed Interest |
|---|---|---|
| Undisturbed obligations | $ 12,698,000 | $ 470,095 |
| 10-yr. serial note to R. C. C. | 663,000 | 26,520 |
| 15-yr. serial note to banks | 3,296,000(a) | 82,400 |
| 15-yr. secured notes to R. F. C. | 25,000,000(a) | 625,000 |
| Sioux City divisional bonds | 4,000,000 | 160,000 |
| Des Plaines divisional bonds | 2,500,000 | 100,000 |
| First and Gen. mtge. bonds A | 55,762,556(a) | 1,394,064 |
| First and Gen. mtge. bonds B @ 4% | 12,100,000 | 524,000 |
| | $117,019,556 | $ 3,382,079 |

| Other Requirements (contingent) | Principal | Charges or Dividends |
|---|---|---|
| Sinking fund (divisional bonds) | | 32,500 |
| Additions & Betterments fund (minimum) | | 2,500,000 |
| 15-yr. serial notes to banks | (a) | 49,440 |
| 15-yr. secured notes to R. F. C. | (a) | 375,000 |
| First and gen. mtge. bonds, A | (a) | 836,438 |
| Second mtge. income bonds, A | 105,058,904 | 4,727,651 |
| Sinking fund (income bonds) | | 525,295 |
| | | 9,046,324 |
| Total *fixed and contingent* | $222,078,460 | $12,428,403 |
| Preferred stock | 106,996,076 | 5,349,804 |
| Common stock | 120,899,773 | |
| Total capitalization | $449,974,309 | |
| Total charges ahead of dividends on common stock | | $17,778,207 |
| Ratio of debt to total capitalization... | 49.35% | |

income tax) equaled $14,625,000, the sum which the Commission has estimated to be the income of the normal year of the future, it would have been insufficient to meet the interest charges during the last ten years. Deficits would have accumulated at a rate in excess of eight million dollars per year.

With outstanding securities limited to $450,000,000, and with interest reduced to and in part made dependent upon income, a revenue of $14,625,000 will leave little for preferred stockholders under the new plan. Nothing could have been paid to either common or preferred stockholders under the existing set up.

Prior to 1929 the spread between the operating revenues and costs and the proportion of net operating income to total operating revenues had been reduced more than 50%. In other words, the percentage of net operating income to total operating revenues was, in 1900, 32.4%. In 1929, it was 19.9%. In 1936 it had dropped to 9.6%. It rose in 1937 to 14.1%.

The conclusion is unavoidable and also most important that the debtor can not continue to operate with an evergrowing indebtedness and a decrease in revenues, unless there is a radical change for the better in gross and net income.

First, and foremost in a plan of reorganization, is the ascertainment of a maximum of securities which may be issued. The amount for all securities, to-wit, $450,000,000, is the I. C. C.'s answer to this inquiry. It meets our approval, not only because it is supported by evidence and is the finding of the I. C. C., but our independent study of the reports convinces us that a larger sum could not be sustained by the company's future business.

The I. C. C. said:

"Competing forms of transportation, loss of export trade, and shifts in sources of traffic appear to have brought about a continuing change for the worse, as regards any reasonable expectation of the ability of this property to produce earnings sufficient to support a capitalization in which the present stockholders might be recognized as possessing equities of any value. Definitely a short-haul carrier, and one looking to passenger traffic for a large part of its business, results show that the debtor has proved particularly vulnerable to high-way competition. Capture of traffic by pipe lines has also been a serious factor, and the pipe line system is expanding."

In reaching our conclusion we must admit that we have been compelled to depend upon the I. C. C.'s estimated income of the debtor in the future. We have not and can not give much weight to original or reproduction cost of the company's properties, although we have not ignored those factors. There is more certainty that the fair value of all assets does not exceed $450,000,000 on an estimated net revenue of $14,625,000 than there is of the correctness of the estimated annual net income figure of $14,625,000. At best the latter figure must have the uncertainty common to all prophecy. While the urge to raise this item, in order to give the old stockholders something for their stock, is strong, the necessity of certainty of interest and dividend payments upon the new securities is quite as important. Moreover, good faith and honesty to all concerned demand a plan which may be reasonably expected to measure up to the expectations of its sponsors. Failure so to do and a return of the debtor to the court for another major operation by the I. C. C. may well witness the demise of the patient.

A valuation is necessary for two purposes. Not only is it necessary to ascertain the presence of value in the old common and preferred stock, but for the purpose of an accurate and wise allocation of new securities. An ascertainment of the productive qualities of the road as a whole, and of the individual branches is quite essential to a fair allocation of new, to holders of old, securities.

It is seriously, and we think legitimately argued, that the Commission should consider reproduction cost in determining value. Section 77 sub. e. While accepting this urge, it must be remembered that reproduction value is but one of many factors which must be considered in determining value. In one case, it may be a material factor; in another it could be rather inconsequential. To illustrate,—an investor's estimate of the value of a timber or mining tract, not in use, but held as reserve, might well be taken at a large percentage of original cost. Where, however, a property is being used to its full extent as a revenue producer, its original cost, and the cost of reproduction, must surrender their claim of

364

importance to the dominance of earnings. In re Chicago, Milwaukee, St. Paul & P. Railway Co., supra; Consolidated Rock Products Co. v. Du Bois, supra. Mr. Justice Holmes, speaking for the Court, said, in Galveston, H. & S. A. Ry. Co. v. Texas, 210 U.S. 217, 226, 28 S.Ct. 638, 639, 52 L. Ed. 1031, "the commercial value of property consists in the expectation of income from it." Consolidated Rock Products Co. v. Du Bois, supra, 312 U.S. at page 526, 61 S.Ct. 675, 85 L.Ed. 982.

■■ While we are not only permitted, but required, [7] to exercise our judgment upon the soundness of these estimated revenues in a normal year, we must concede the superior ability and opportunity of the I. C. C. to pass judgment on such a factual question. It is unfortunate that the soundness of estimates must be incapable of demonstration to a mathematical certainty. But prophecy is ever subject to such criticism. Nevertheless, the difficulty and the uncertainty as to correctness of estimates, do not relieve the I. C. C. (or us) from meeting the obligation. Consolidated Rock Products Co. v. Du Bois, supra.

■ The unusual and extraordinary increases in revenue of carriers during the last year have made the Commission's estimate the subject of determined and vigorous attack by the stockholders. This has caused us no end of anxiety and concern. This radical change (for the better) in the past year can not and should not be ignored. Nor can we dismiss it as undisclosed by the record which deals with a more distant past. It is something we can, and should, and do, take judicial notice of. It is, we believe, temporary, and like a crop failure year, in the Northwest—which this Debtor serves—not to be taken too seriously when viewing the long future of this railroad. In making this statement we are aided by the experiences of railroads during and after the last war.

It must, however, be a fact of vital importance that a substantial increase in revenue and a corresponding increase in value of assets would still leave nothing upon which the old stockholders could predicate a value for their stock.

Were it not for the provision of the statute which requires the I. C. C. to consider the reproduction cost in determining value, we would look for even greater guidance, to the earning power of the company, than was done by the I. C. C.

The finding which determined the absence of value in the common and preferred stock must be, and is, approved as fair to the creditors, to the stockholders, and to the public.

Relying on our holding in In re Chicago, Milwaukee, St. Paul & P. Railway, Debtor, supra, that the I. C. C. failed to make findings of values, sufficiently detailed to permit us to pass intelligently on the fairness of the plan and the reasonableness of the allocation of new securities among holders of old securities, the various appellants ask us to reverse and remand the case for further evidence and more detailed findings by said I. C. C.

This case differs from the Milwaukee case in this respect. Here, the creditors have received the plan and voted, almost unanimously, their approval of it. Our question then is not restricted to the sufficiency of findings to support the plan, but it is a review of a plan *which has the approval of the various groups of creditors.* The stockholders are eliminated. The creditors alone are entitled to the assets of the debtor. They are also entitled to a fair allocation of new securities in view of the value of their old bonds, having due regard to the value of the liened property and the future earnings of the road.

■ While fairness is a somewhat relative term and is not measurable, in its practical application, with mathematical certainty, courts will not go beyond the expressed assent and approval of the bondholders to ascertain whether fairness in distribution attained the goal of perfection. If the creditors who are to share an insolvent estate understandingly agree on a division thereof, the problem of the court has been solved.

The creditors are divided into 21 groups, 14 of which passed upon the plan. They and the percentage of acceptance of their vote, are herewith set forth.

---

[7] "The question whether a plan of reorganization is 'fair and equitable' within the meaning of § 77B of the Bankruptcy Act [11 U.S.C.A. § 207], is a question of law." Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (headnote 1).

Table on Vote of Various Class of Creditors on Plan:

| Class | Name of Security | Total Outstanding | Amt. Voted* | % of vote in favor of plan |
|---|---|---|---|---|
| (5) | Preferred claims ................$ | 25,823.49 | $ 25,823.49 | 100. |
| (6) | General mortgage bonds........... | 132,019,000 | 100,610,500 | 96.06 |
| (7) | Sioux City & Pac. bonds........... | 4,000,000 | 3,464,000 | 100.00 |
| (8) | Mil. & State Line bonds........... | 2,500,000 | 2,150,000 | 50.37 |
| (9) | Manitowoc, Green Bay bonds...... | 3,750,000 | 3,169,000 | 100. |
| (10) | St. Paul Eastern bonds............ | 1,120,000 | 796,000 | 83.79 |
| (11) | Mil., Sparta & N. W. bonds....... | 15,000,000 | 9,794,000 | 98.28 |
| (12) | Des Plaines Valley bonds.......... | 2,500,000 | 1,872,000 | 98.66 |
| (13) | St. Louis, Peoria & N. W. bonds... | 10,000,000 | 7,223,000 | 99.56 |
| (14) | 1st and refunding bonds........... | 47,822,000 | 24,642,000 | 97.75 |
| (15) | 15-year 6½% bonds............... | 14,775,000 | 8,641,000 | 98.43 |
| (16) | Convertible 4¾% bonds........... | 72,335,000 | 21,358,000 | 87.10 |
| (18) | Collateral promissory notes........ | 47,313,882 | 47,049,192.55 | 100. |
| (21) | General claims ................... | 1,017,375 | 203,941.47 | 98.66 |
| | Total ...................... | $354,178,080 | $230,998,457.51 | 96.2 |

*Additional defective ballots: Class (6), $2,760,500; Class (7), $10,000; Class (9), $27,000; Class (10), $7,000; Class (11), $457,000; Class (12), $3,000; Class (13), $128,000; Class (14), $1,145,000; Class (15), $159,000; Class (16), $669,500; Class (21), $3,277.50.

As to the classes omitted, it should be said the plan was not submitted to them, either because they were not affected, were paid in full, or as in the case of stockholders, it was believed they had no interest under the absolute priority principle applicable in this case.

Four groups representing claims which aggregate approximately $54,000,000 and interest, have voted unanimously in favor of accepting the plan. Five other groups voted more than ninety-eight per cent for accepting the plan. These bond issues aggregate $27,000,000 and interest. Two groups, whose total outstanding bonds aggregate $180,000,000, voted more than ninety-six per cent for the plan. All groups, save one, overwhelmingly favored the plan. The one exception is the Milwaukee and State Line Group. The total of this issue was $2,500,000, and 50.37% favored accep-

tance. [8] The Equitable Life Assurance Society of the U. S., and an affiliate, the Equitable Credit Union, voted their holdings of $1,003,000 against the plan.

This single exception to the strong approval, which the plan evoked from the creditors, necessitated separate treatment by the District Court, as it does here: Section 77 provides for approval of the plan without the approval of two-thirds of the creditors of a class, provided the court, after hearing, finds that the plans make adequate provision for fair and equitable treatment of the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of all parties, including particularly the group affected.

The District Court squarely met this issue and made a finding of fairness, [9] etc.,

[8] The percentage figures are based on claims voted. There were many bondholders who did not vote.

[9] "The objection that the confirmation of the plan without the approval of the State Line holders would work a confiscation of property and a deprivation of property without due process of law was answered when the Constitution, containing a grant to Congress of the power to enact laws 'on the subject of bankruptcies' was adopted

"All bankruptcy laws which release and compound debts work confiscations and deprivations of property, but such confiscations and deprivations are not violations of the Constitution; on the contrary, they are expressly permitted by it. Furthermore, the power to confirm a composition over the objection of 33⅓% of the creditors is exactly the same kind of a power as the power to confirm a composition over the objection of 49.63%, of for that matter over the objection of

which avoided the necessity of a two-thirds vote of approval by this group.

The District Court's finding is here assailed as contrary to the evidence, and as having been made to avoid an adverse group vote in the otherwise perfect record of approval.

We will consider this phase of the case later, for we are now interested in the effect of the approval of the plan by the vast majority of the creditors, of different groups, on the various objections which have been raised.

■ As to those groups which have, without opposition of a single bondholder, expressed approval, we have no doubt the plan should be approved. Surely, the parties have a right to settle their law suits, to compromise their claims, and, in a bankruptcy proceeding, to stipulate as to the division of the estate among themselves.

As to those who represent better than ninety-six or even ninety-nine per cent, the question is not quite the same. The question then becomes,—To what extent may a creditor exercising his nuisance value right, defeat the long awaited and carefully worked out plans of the constituted authorities and approved by practically all who have taken the time to study and analyze it?

■ The Bankruptcy Amendment of 1932 was intended to defeat the efforts of nuisance value makers. They were no more popular with Congress than they had been with the courts. Case v. Los Angeles Lumber Co., 308 U.S. 106, 129, 60 S.Ct. 1, 84 L. Ed. 110. To both, they were looked upon as parasites. By permitting railroads to reorganize under the Bankruptcy Act, it was hoped their efforts would be frustrated. This was the object of Congress, the purpose of the Amendment, Sec. 77. The instant case raises the question,—May the Congressional objective be frustrated by a group which represents one-fourth of one per cent of the creditors?

■ It is not a question of a necessary majority (two-thirds). The majority in each group, in the case before us, was far greater than the minimum requirement. It is a question of whether the report of the I. C. C., which was full and complete, fair and open, but lacking in one respect,—fail-ure to make specific findings of values,—may, or should, be approved without said findings. In fact, the issue may be stated even more strongly against the minority. Does not the vote of approval supply the proof that the report of the Commission contained the evidence, and the Commission's finding sufficiently state the facts, to justify us in holding that separate and more detailed findings are unnecessary? We think it does.

We have no doubt that if the decision in Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, had been announced before the findings of the I. C. C. in this case, the evidence which was before the I. C. C. would have been collected and stated in formal findings rather than in explanatory statement and fact assumptions. The story, factual and statistical, however, was all told. Its more important features were related in reports of an examiner and later, in the report of the I. C. C.[10]

Doubtless, the creditors and the counsel who helped the I. C. C. solve this problem, obtained a rather clear idea of the difficulties of measuring the relative weight of the contentions of two claimants, each holding a thousand dollar bond—one on one division, and the other on another division—each the direct obligation of the Debtor. Each division was somewhat dependent on the other for its profit producing ability. Each was, and had been for years, in default as to interest. Each division had both advantages and disadvantages over the other and both were suffering in increasing intensity from hard road truck competition. Likewise, these creditors who voted affirmatively (practically all who voted) also learned that it was no simple arithmetic problem to appraise accurately the value of the securities which each bondholder received in the reorganization.

. Could these bondholders not waive a requirement that the I. C. C. fix value of the property covered by each mortgage? We think they could. Could they not waive the necessity of the I. C. C.'s making more specific findings? They could, and did. No objecting creditor, *at the time*, objected to the I. C. C.'s failure to separate its findings or to make separate coverage of specific

100% of them. It is a bankruptcy power."

[10] Both overflowing with material facts and records of volume of business, earnings, and trends.

property. If they felt the task was too great, or the results no better than the deductions which the apportionment of new securities indicated, we would not condemn them for their neglect, but say they were practical men who realized that additional specific findings would not change the result nor make the court's study much more intelligent.

In short, we hold, the approval of the plan differentiates this case from the Milwaukee case. It was an equivalent of a waiver of more specific findings by all who approved the plan. It also supplied the proof that the report gave the bondholders sufficient facts to understand and appraise the worth of the plan.

Thus far we have considered the effect of the approval of the creditors of the plan submitted by the I. C. C. As to them, the objection that the findings of the I. C. C. are insufficient and lacked specificity, is unavailing.

 However, there are a few who opposed the plan and still oppose it and who objected to it for its lack of specific findings by the I. C. C. There is still another group, of larger size, which did not vote and who do not *now* either object to, or express an approval of, the plan. Doubtless many of them are of the kind heretofore referred to, namely, small holders of securities, who could not afford to go to Washington or employ counsel to express their wishes or even to study the plan and advise them. There are still others who may have larger holdings, but who have apparently left it to the court to protect them and to see that a fair plan is adopted.

If we are correct in our assumption that those who did not vote and those who have neither specifically objected to, nor approved of, the plan, have left it to the court to represent them, we accept the responsibility and vote their interest in favor of the plan. While the responsibility for acting both as umpire and as guardian for the many small and unknown bondholders scattered throughout the United States is a somewhat large one, we are not at liberty to decline it, nor to avoid its burden. Our approval of the plan is so whole-hearted that we have no hesitancy in the matter. All arguments seem to favor approval.

We favor it, because:

All the creditors of each group who have voted, are overwhelmingly in favor of it.

Such a plan, if consummated, would terminate these lengthy proceedings. There must be an end to the most involved litigation. Seven years is a long time for bondholders to go without any interest. In the case of Continental Bank v. Chicago, Rock Island Ry., 294 U.S. 648, 685, 55 S.Ct. 595, 610, 79 L.Ed. 1110, Justice Sutherland, speaking for the court, said:

"The delay and expense incident to railroad receiverships and foreclosure sales constituted, probably, the chief reasons which induced the passage of section 77; and to permit the perpetuation of either of these evils under this new legislation would be subversive of the spirit in which it was conceived and adopted. Not only are those who institute the proceeding and those who carry it forward bound to exercise the highest degree of diligence, but it is the duty of the court and of the Interstate Commerce Commission to see that they do. Proceedings of this character, involving public and private interests of such magnitude, should, so far as practicable, be given the right of way both by the court and by the commission, to the end that they may be speedily determined."

These words should be read by the trustees of every railroad in reorganization. They have carried little weight in the past, with the trustees or their counsel.

Numerous plans have been submitted, none of which meets with as much satisfaction as the one before us. The present plan can not be compared with perfection, for perfection would provide for payment of one hundred per cent cash to each bondholder. Also, the stockholders would be given dividend bearing stock. Unfortunately, the revenue of the Debtor makes it necessary to face realities, not act on unfounded hopes, or dwell in air castles.

 Debtor's bonds have been practically unsalable. We must take judicial notice of the fact that most of them, during the last five years have sold at around ten cents on the dollar. Not one of them has sold at or near par. During most of the last five year period the common stock has sold for less than one cent on the dollar. No dividends have been paid.

The company has been kept in operation only through the assistance of, and moneys loaned by the R. F. C. The Debtor has been unable to pay interest upon the advances thus made.

If the plan is viewed, as the stockholders urge, with an optimist's outlook as to future earnings, then those sharing in the new securities will be agreeably surprised by their value and their unexpected strength in price and in salability.

Finally, the plan must be examined from the viewpoint of the public. The Debtor, like all common carriers, has no excuse for its existence, save as it may serve the public. It is a quasi-public institution. It exists by the favor of the public. Service to the public is the sole consideration for its existence and continued operation. A railroad which is floundering about in overwhelming debts, handicapped by lack of means, with which to purchase needed equipment, unable to borrow money at satisfactory interest rates, and overwhelmed by the cost and expense of receiverships—cannot render satisfactory service to the public, nor pay interest or dividends on its outstanding securities. Successful operation is quite as essential to the public as it is to the security holders. Satisfactory operation is dependent, in the last analysis, on profitable operation. A hopelessly involved railroad is in no better position to conduct its business satisfactorily than a business man whose time is spent meeting and disputing with creditors. The public has a right to demand that debtor put its house in order. In other words, the public interest, and the railroad's prosperity, are interdependent.

What is stressed, however, is this—in no plan of reorganization should the I. C. C. or the courts ignore the requirement of the territory served or the possible effect of the plan on the ability of the road to render necessary service to it.

Convinced as we are of the advisability of the plan and of its great improvement over present conditions, and impressed by the failure of any interested parties to produce a better or more satisfactory one, we are impelled to cast the vote of the silent security holders, who have left the responsibility to us, in favor of the plan.

■ Nor can we ignore the fact that the attack in this court has been waged largely by trustees named in Debtor's numerous mortgages. They assert a right to appeal and attack the plan although the great majority of the bondholders, for whom they assume to speak, are satisfied and opposed to their appeals. In fact, the trustees assert they are within their rights (and duties) to take these appeals even though all the bondholders of their particular mortgage are all satisfied with the reorganization and all oppose the taking of an appeal by the trustees. We think otherwise. This is hardly the place to discuss or decide the authority of the trustees to prosecute appeals, irrespective of their bondholders' wishes, however. The most liberal construction of powers of trustees to litigate and to take a position antagonistic to the views and wishes of the great majority (or all) of the bondholders and to load the disturbed and distracted creditors with large expenses, emphasizes our reasons for bringing the litigation to an end at the earliest possible date.

Our conclusion is reached on the assumption and belief that no property right of any bondholder is impaired, or is involved. His rights and all of them are preserved, including the right to vote against the plan and to object to its approval, when outvoted by other bondholders of his group.

■ Subjecting all bondholders to the control which bankruptcy legislation necessitates is not an unconstitutional impairment of his contract rights. In re Chicago, R. I. & P. Ry. Co., 7 Cir., 72 F.2d 443.

Nor is there any jurisdictional question involved.

Had the necessary percentage of bondholders not voted for the plan, or the District Court not made favorable findings in the case of a single group whose bondholders had failed to give a two-thirds majority in favor of the plan, we would have been confronted by an insurmountable jurisdictional objection. Such, however, is not the situation. The objection we are dealing with,—a failure of the findings of the I. C. C. to be sufficiently specific,—presents a procedural question. True, in many instances, this procedural question looms large and may be of controlling importance. Nevertheless, it is not jurisdictional in character. We are satisfied that different facts and a different law, under which the reorganization of railroads is authorized, distinguish this case from the Consolidated Rock Products case.

Confronted then, by a situation which involves neither jurisdictional nor property right objections, we have approached, considered, and disposed of the findings requirement, from four angles:

(a) The effect of waiver by a large percentage of bondholders upon the procedural requirement of specific findings.

(b) The completeness of the evidence on the specific issue whereon findings could and should have been made.

(c) The conclusive nature of other findings which make coverage by the missing specific findings less important.

(d) The persuasive effect of facts shown by the record and reduced to findings by the I. C. C., which strongly support the plan submitted and approved by the District Court and the creditors.

Coming now to the more specific questions, and conceding the right of the trustees to raise them, we take up the criticisms of the bondholders of the different groups.

We are satisfied that the holders of all bonds will improve their position by the adoption of the reorganization plan. As among the various groups, it is possible that one may be treated better than another. But considering them together, it is clear, we think, that all groups are benefited by this new plan.

This conclusion is based in part upon the elimination of the old stockholders and the reduction in fixed and contingent interest charges. The position of the outstanding bondholder has been, and is, a sorry one. He has not been paid interest. The salability of his bonds has been greatly impaired. The Debtor has been solely dependent for the continuance of its operation, on aid from the R. F. C. The market value of his bonds has been, and is, but a small percentage of their par value. To say that under the new plan the bondholders' position will be better, is not loud praise for the new plan.

The only valid objections must be due to, and arise out of, alleged unfairness in allocation of new securities.

We dismiss, without discussion, although not without due consideration, all of the objections advanced because of unfairness in allocation of new securities, excepting those which assail the alleged preference shown the R. F. C. on its $49,000,000 claim, and the complaint of the holder of bonds of the so-called State Line Mortgage.

In reference to the contention made by numerous groups that the R. F. C. obtained preferential action at the hands of the I. C. C. we refer to the opinion of the District Court and to the report of the I. C. C. Our conclusion is that there was discrimination here, but it was against, rather than in favor of the R. F. C. It is the R. F. C. which has legitimate grounds for complaint. We can no more ignore the change in conditions during the last year, when considering this phase of the appeal, than we could when considering the plea of the common and preferred stockholders.

The R. F. C. held collateral security which it could convert into cash at any time. [11] No other group of bondholders was secured by marketable collateral security of the approximate value of its debt.

If the reorganization plans are to be upset and all bondholders and all groups put back to their old position, the R. F. C. could now realize the full amount of its claim through the sale of its collateral. Likewise, if we assume that the plan be rejected and the proceedings dismissed, its legal right so to do would be clear.

However, the Debtor would be greatly embarrassed through the sale of $94,000,000 of its obligations for less than fifty cents on the dollar. The I. C. C., therefore, at the expense of the R. F. C. sought to protect the Debtor. Protecting the Debtor was protecting all of the other groups of security holders.

Added reasons may be found in the clear statement of reasons given by the I. C. C., and also found in the opinion of the District

---

[11] (1) 20,850 shares Union Pacific R. R. Co. preferred stock.

$100,000 principal amount New York Central & H. R. R. R. Co. Refunding and Improvement bonds.

$64,000 principal amount N. Y. Central R. R. Co., consolidated bonds.

(2) $104,000 principal amount Debtor's equipment trust certificates, Series Y.

$128,000 principal amount Omaha equipment trust certificates, Series I.

$45,186,000 principal amount Omaha first mortgage bonds.

20,000 shares Superior Coal Co. common stock.

15,200 shares Indiana Harbor Belt R. R. Co. stock.

9,458 shares Sioux City Bridge Co. common stock.

(3) $1,976,000 principal amount Debtor's General Mortgage bonds.

$47,676,000 principal amount Debtor's First and Refunding bonds.

370

Court, who specifically dealt with this subject.

■ The objections of the Trustee of State Line mortgage necessitate a consideration of the different ways adopted by appraisers to ascertain the value of a branch of the railroad known as a cut-off or bridge line. On such a division no freight originates. It was constructed and is used to relieve a congestion of traffic. In·the instant case the traffic bottleneck is between Milwaukee and Chicago.

Accountants have chosen different names and adopted different methods of ascertaining value. We will not go into them in detail. The proponents of the different plans were all heard. The bond issue is to secure a $2,500,000 loan. Over half of the bondholders in volume and number favor the plan. Less than one-half or about $1,000,000 in volume, are opposed to the plan. One creditor, with a claim of less than one-fourth of one per cent of debtor's total indebtedness is attempting to block and defeat the plan. And said creditor is speaking through a trustee who is misrepresenting a majority of the holders of bonds for whom it speaks. And more, it asks compensation for itself and its counsel for performing this work.

Its contention that it should have received a larger percentage of the first mortgage bonds provided for in the plan was considered by I. C. C. and the court. We must accept the conclusion of the I. C. C. thereon. We confess to the existence of a doubt. We are satisfied that its position will be better under the new plan allocation than it is today. It has received but a small part of its interest in the last five years. Salability and market value have both been low. The new securities which it is to receive ought to draw interest and dividends with reasonable certainty. At least the chances of getting interest on the bonds will be better than they have been or are today. We would not be justified in disturbing this phase of the plan.

We have considered other objections which we deem it unnecessary to discuss separately. They are all overruled.

In appeals Nos. 7740–41, in re payment of interest in accordance with confirmed plan, to new security holders, the decree is affirmed.

The decrees are affirmed.