**CHICAGO, R. I. & P. RY. CO. et al. v. FLEMING et al. (two cases).**

**ST. LOUIS UNION TRUST CO. v. FLEMING et al.**

**AXELROD et al. v. SAME.**

**Nos. 8929–8931, 8938.**

Circuit Court of Appeals, Seventh Circuit.

May 23, 1946.

As Amended on Denial of Rehearing June 20, 1946.

Writ of Certiorari Denied Nov. 18, 1946.

See 67 S.Ct. 201.

---

Loy N. McIntosh, of Chicago, Ill. (Gann, Secord, Stead & McIntosh, of Chicago, Ill., of counsel) for appellants Carter H. Harrison et al.

Alfred Berman and Guggenheimer & Untermyer, all of New York City, for William J. McEnery, amicus curiae.

Henry F. Tenney, of Chicago, Ill., and John Gerdes, of New York City, for Chicago, R. I. & P. Ry. Co.

R. H. McRoberts and T. S. McPheeters, Jr., both of St. Louis, Mo., and J. F. Dammann and Benj. H. Weisbrod, both of Chicago, Ill. (Bryan, Cave, McPheeters & McRoberts, of St. Louis, Mo., and Wilson & McIlvaine, of Chicago, Ill., of counsel), for St. Louis Union Trust Co.

Harry Kirshbaum, of New York City, and Michael Gesas, of Chicago, Ill., for Convertible Bond Holders Group.

Edward K. Hanlon, Walter H. Brown, Jr., Edward W. Bourne, and Wilkie Bushby, all of New York City, F. H. Towner, of Chicago, Ill., Sanford H. E. Freund, of New York City, Otis F. Glenn, W. F. Peter, and Irwin T. Gilruth, all of Chicago, Ill., and Alexander M. Lewis, of New York City, Alexander & Green, of New York City (Clyde W. Sorrell, of New York City, of counsel), Winston, Strawn & Shaw, of Chicago, Ill., White & Case, of New York City (Jesse E. Waid, of New York City, of counsel), Winston, Strawn & Shaw, of Chicago, Ill., and Root, Ballantine, Harlan, Bushby & Palmer, of New York City (Joseph Schreiber, of New York City, of counsel), Rathbone, Perry, Kelley & Drye, Shearman & Sterling & Wright, Beekman & Bogue, and Willkie, Owen, Otis, Farr & Gallagher, all of New York City, for Fleming and Colnon, trustees.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

Appeals are taken by four separate groups of appellants from an order approving a plan of reorganization for the Chicago, Rock Island and Pacific Railway Company. On oral argument the cases were heard together and will be treated in one opinion because of the similarity of issues raised.

On June 7, 1933, the debtor railway company filed a petition under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Because of the debtor's low earnings in the years immediately following the petition and the necessary delay created by the Interstate Commerce Commission in the evaluation of plans, a plan of reorganization was not approved by the Commission until July 31, 1941. This plan was certified to the District Court and on June 3, 1943, the court approved the plan except on two points, In re Chicago, R. I. & P. Ry. Co., D.C., 50 F.Supp. 835. The two points were that the claims of the general mortgage bonds had not been fully satisfied because the new common stock allotted to them at $100 a share was not worth that amount, and that the appointment of reorganization managers by representatives of creditors should be subject to the approval of the court. In accordance with subsection (e) of § 77 the plan was referred back to the Commission for correction on the two matters along with a request by the court that the Commission determine in the first instance the cash available for distribution among the creditors as of December 31, 1943. The Commission held a hearing and after the filing of briefs certified its second plan to

the court in May, 1944, in which it made various changes in the original plan, including the allocation among creditors of $38,011,922 of cash which was all that was found to be available for distribution on January 1, 1944. This modified plan was approved on June 15, 1945. It is from this order that the appellants appeal.

Under the plan of reorganization, the capitalization of the debtor was reduced from $459,101,932 to $356,117,327. All the creditors, secured and unsecured, are provided for in varying degrees. The preferred and common stockholders do not participate in the plan because it was found that their equity was of no value. The new capitalization is divided into first mortgage bonds, second mortgage income bonds, preferred stock having a par value of $100 per share, and no par value common stock.

The appellants in 8929, the preferred stock committee, represent a group which does not participate in the plan. They contend the Interstate Commerce Commission, on the reference back to it of the proposed plan of reorganization by the court, was required by § 77(d) of the Bankruptcy Act to proceed de novo. In 8930, the debtor urges that the plan is not fair and equitable because it discriminates unfairly in favor of the senior creditors to the detriment of the junior creditors and that the plan violates legal standards in the degree of participation among the various classes of creditors and stockholders. In 8931, the trustee of the Little Rock and Hot Springs Western Railroad Company alleges that the Commission did not follow legal standards in determining the value of the security for its bonds; that the Commission may not provide for the sale piecemeal of the Little Rock line, the entire line of which is the security for these creditors' bonds. In 8938, the convertible bondholders group represent a class of unsecured creditors who are to receive approximately 34% of their total claims. Like the others they dispute the fairness of the plan. They question the distribution among the creditors by the Commission. They also claim that the Chase National Bank, trustee for the issue of unsecured convertible bonds, has violated its trust and exercised dual and conflicting roles of trustee and creditor.

The Supreme Court in two recent cases, Ecker v. Western Pacific Railroad Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 and Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, has clarified and defined the role the Circuit Court of Appeals must assume in railroad reorganizations. Definite restrictions are placed on this court and it is the sole responsibility of the Interstate Commerce Commission to develop the capitalization of the reorganized company. The function of the District Court is principally that of moderator or umpire. By authority of subsection (e) of § 77 of the Act it is the duty of the court to examine the plan to see whether it is fair and equitable; whether it affords due recognition to the rights of each class of creditors and stockholders; and whether there is any unfair discrimination in favor of any class of creditors or stockholders. The court must approve or disapprove the plan in its entirety. It alone cannot correct the plan but it may suggest improvements to the Commission. So long as legal standards are followed, the judgment of the Commission on the capitalization is final. Ecker v. Western Pacific R. Corp., supra, 318 U.S. 474, 63 S.Ct. 692. This court may reverse only if the Commission has failed to follow legal standards in arriving at questions of valuation and capitalization, and the District Court has failed to perform its functions under the Act, Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., supra.

The appellants do not question the applicability of the cases cited, but collectively they urge reversal on the grounds of unfairness and discrimination between class allocations in the plan, and the Commission's failure to follow legal standards in the capitalization of the reorganized company. Other contentions are advanced but, as will be shown, they are either untenable or mere divisions of the two principal allegations.

The preferred stock committee raises a question of procedural error regarding the manner in which the Commission handled the original plan when the plan was referred back to it by the District Court. This appellant contends that under the requirements of subsections (d) and (e) of § 77 of the Act, the Commission mandatorily is required to proceed as though this were an entirely new plan of reorganization. That is, the Commission must set a hearing date on any new plans of reorganization—one of which must be filed by the debtor, while others may be filed by the trustees, creditors and stockholders —but no plan may be considered until six months after the order referring the proceedings back to the Commission.

■■ This appellant concedes that this is an entirely new matter which has never before been passed on in reorganization proceedings. The District Court in approving the modified plan overruled this objection but without explanation. We fail to find any merit in the objection. True, this is a question of interpretation, but the appellant's interpretation is stilted and impractical. The Commission is the protagonist in a reorganization proceeding, because, as previously stated, it is the best qualified. It provides for the new capital structure and the distribution of corporate funds. In short, the Commission is allowed wide discretion in reaching its conclusions, and if its findings are supported by substantial evidence and follow legal standards they must be affirmed by the courts, Palmer v. Commonwealth of Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93; Brooks v. St. Louis-San Francisco Ry. Co., 8 Cir., 153 F.2d 312. Yet by this appellant's interpretation on the reference back to the Commission, the latter is deprived of its discretion and mandatorily must proceed de novo.

The Supreme Court has emphasized the urgency for interplay and harmony between the Commission and courts in reorganization proceedings, Palmer v. Massachusetts, supra, 308 U.S. 87, 60 S.Ct. 34, 84 L.Ed. 93; Warren v. Palmer, 310 U.S. 132, 138, 60 S.Ct. 865, 84 L.Ed. 1118. Congressional intention as interpreted by the Supreme Court seemingly would be ignored if we were to recognize the contention that the relations between the Commission and the District Court are so alien to each other that when part of a plan of reorganization is rejected those remaining parts of the plan even though approved also must be rejected. As to the disputed words of subsection (e), " * * * it shall proceed to a reconsideration of the proceedings [on the reference back to the Commission] under the provisions of subsection (d) of this section," we believe that with respect to any modified or old proceeding, the Commission complied with the vital time requirements of subsection (d) when at the initiation of the proceedings it waited the necessary six months. Full compliance with subsection (d), therefore, would be approval by the Commission and certification to the court of the modified plan. This was done, and for these reasons the appeal of the preferred stock committee must fail.

The debtor seeks nothing for itself. It is in the anomalous but commendable position of arguing for others. The debtor, appropriately, does not question the valuations of the Commission. It contends, however, that the Commission erred as a matter of law when it reduced the total capitalization from $368,127,410 to $356,-117,327 in the modified plan here on review. It says that because the Commission determined the debtor's assets at one figure, it is precluded from reconsideration unless there has been a new determination of the fair value of assets. Otherwise, the debtor argues, the fund to be divided among the creditors could be reduced indiscriminately.

■■ In so arguing, it seems to us that the debtor overlooks the point that any determination of total capitalization by the Commission is in itself a valuation, which, concededly, is not subject to review. The court in the case of Brooks v. St. Louis-San Francisco Ry. Co., supra, was confronted with an analogous argument as to arbitrary value, and it answered with reasoning worthy of quotation. On p. 316 of 153 F.2d the court said: "It is clear that

the Commission has the power to limit total capitalization and its finding on the question of reorganization value is not subject to review. It is urged, however, that the Commission arbitrarily assumed a value, and complaint is made that the Commission did not, in words at least, find or fix the value of the property involved. In view of the very extensive investigation by the Commission of every element or factor having any conceivable bearing on the question of future earning capacity, including the condition and nature of the physical properties, the past earnings record and all circumstances which bear upon the question of future earnings or value, it can not reasonably be said that the Commission assumed anything." But by authority of the Act, § 77(d), the plan approved by the Commission must "be compatible with the public interest." Our course, we believe, is made quite clear by the language in Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., supra, 318 U.S. 544, 63 S.Ct. 740, 87 L.Ed. 959: "The nature of the capital structure, as well as the amount of the capitalization, is a component of 'the public interest.'" And as the court further points out, this means " 'preservation of the transportation system and the stability of its credit essential to its preservation depend not alone upon the ability of individual carriers to meet their obligations, but upon the ability of all to attract the investment of funds in their securities.' "

The reason given by the Commission for the decrease of $12,010,083 in capitalization is that "The capitalization of $356,-117,327, includes equipment obligations outstanding as of January 1, 1944, and the capitalization of $368,127,410, includes such obligations outstanding as of January 1, 1942," Supplemental Report of the Commission, May 1, 1944, 257 I. C. C. 307, 308. A provision was made for an increase in the common stock of $1,024,833 because the reduction in the amount of equipment obligations reduced the annual cash requirements of the reorganized company. The decrease in capitalization then was the result of bringing the plan up to date, for $13,034,916 in equipment obligations

was to be paid off by January 1, 1944. The Commission took cognizance of an inevitable reduction. It is, therefore, not within our province to question this action by the Commission. As observed again in the Group of Institutional Investors case, 318 U.S. at page 556, 63 S.Ct. at page 745, 87 L.Ed. 959 " 'Practical adjustments, rather than a rigid formula, are necessary.' " The language was used in regard to senior creditors' claims, but it is applicable because here, as there, the findings and conclusions of the Commission were in effect disputed. In its Supplemental Report of May 1, 1944, supra, 257 I. C. C. 308, the Commission clearly is following the "practical" doctrine for the Commission "also recognized that the amount of equipment obligations of a railroad is subject to fluctuation upward as well as downward, and *in our opinion,* we would not be warranted in increasing the amounts of the various other classes of securities comprising the approved capitalization to any greater extent than was done." (Italics ours.)

We cannot say that the Commission has acted unfairly or even indiscriminately in reducing the capitalization of the reorganized company because not only did it have the authority to reduce the capitalization, it has exercised this authority seemingly for excellent reasons. "The question in each case is one for the informed discretion of the Commission and the District Court. We cannot say that that discretion has been abused here," Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co., supra, 318 U.S. 564, 63 S.Ct. 748, 87 L.Ed. 959.

Under the plan of reorganization as finally adopted, only the claims of the General Mortgage Bonds and the Choctaw & Memphis First Mortgage Bonds are wholly satisfied. These claims total about $91,500,000. Other secured creditors are not made whole and it is futile to contend, as the debtor does, that the remaining secured creditors are paid in full. In the Supplemental Report of the Commission, decided May 1, 1944, supra, 257 I. C. C. 318, an appendix is set out which lists the

distribution of reorganization securities and cash.[1] From this it is obvious that

[1] SUPPLEMENTAL REPORT OF COMMISSION, MAY 1, 1944.

Distribution of Reorganization Securities and Cash.

| Outstanding issues | Principal of claim estimated as of Jan. 1, 1944 | Claim principal and interest estimated as of Jan. 1, 1944 | Cash | Participation under the plan | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Notes and undisturbed [1] | First mortgage 4's due 1994 [2] | General mortgage income, 4½'s due 2019 [3] | 5-percent preferred stock [4] | Common stock no-par value [5] | |
| C., R. I. & P. equipment obligations... | $11,909,000 | $11,909,000 | ...... | $11,909,000 | ...... | ...... | ...... | ...... | $11,909,000 |
| C., R. I. & P. general-mortgage 4's, due 1988 | 61,581,000 | 86,213,400 | $11,647,430 | ...... | $8,850,811 | $27,936,546 | $27,463,762 | $20,714,220 | 96,642,769 |
| C., R. I. & P. first and refunding mortgage 4's due 1934 | 104,470,000 | 148,411,127 | 10,678,923 | ...... | 9,605,225 | 24,312,022 | 21,899,202 | 54,830,960 | 121,326,332 |
| C., R. I. & P. secured 4½ percent bonds, due 1952 | 39,813,600 | 59,021,174 | 4,600,000 | ...... | 4,137,409 | 10,472,298 | 9,432,986 | 23,618,198 | 52,260,891 |
| C. & M. first-mortgage 5's, due 1949 [u] | 3,524,000 | 5,286,000 | 1,762,000 | 3,524,000 | ...... | ...... | ...... | ...... | 5,286,000 |
| C., O. & G. consolidated-mortgage 5's, due 1952 | 5,411,000 | 8,296,867 | 945,139 | ...... | 507,857 | 2,683,223 | 2,818,915 | 1,026,987 | 7,998,121 |
| St. P. & K. C. S. L. first-mortgage 4½'s, due 1941 | 9,983,755 | 14,888,139 | 873,271 | ...... | 989,454 | 1,610,709 | 1,283,769 | 5,735,342 | 10,497,545 |
| R. I., A. & L. first-mortgage 4½'s due 1934 | 11,000,000 | 16,362,500 | 1,302,950 | ...... | 1,276,606 | 2,941,282 | 2,380,053 | 5,077,385 | 12,978,277 |
| L. R. & H. S. W. 4-percent notes, due 1939 | 453,600 | 607,824 | 87,905 | ...... | 93,450 | 215,328 | 174,241 | 72,322 | 643,256 |
| B., C. R. & N. consolidated first-mortgage 5's due 1934 | 11,000,000 | 16,912,500 | 618,200 | ...... | ...... | 1,100,000 | 2,750,000 | 5,809,833 | 10,278,033 |
| P. Ry. T. Co. first-mortgage 4's due 1937.. | 928,000 | 928,000 | (To be extended to January 1, 1967 without guarantee by the Reorganized Company) | | | | | | ...... |
| Bank loans (collaterally secured) [7].. | 3,811,006 | 6,013,629 | 1,352,650 | ...... | 1,385,364 | 2,749,742 | 2,335,362 | 7,983,085 | 15,805,003 |
| R. F. C. loans (collaterally secured) [8].. | 13,718,700 | 20,849,015 | 3,782,172 | 2,500,000 | 4,070,874 | 5,992,850 | 4,461,710 | 11,143,768 | 31,901,374 |
| C., R. I. & P. unsecured-convertible 4½'s, due 1960 | 32,228,000 | 47,697,440 | 400,272 | ...... | ...... | ...... | ...... | 16,077,813 | 16,405,085 |
| General creditors..... | 500,000 | 500,000 | 6,210 | ...... | ...... | ...... | ...... | 248,353 | 254,563 |
| C., R. I. & P. preferred stock..... | 54,532,789 | 54,532,789 | Equity found to be of no value; preferred stockholders do not participate in the plan. | | | | | | ...... |
| C., R. I. & P. common stock..... | 74,359,723 | 74,359,723 | Equity found to be of no value; common stockholders do not participate in the plan. | | | | | | ...... |
| Totals.......... | 439,224,173 | 572,789,127 | 38,011,922 | 17,933,000 | 30,917,060 | 80,000,000 | 75,000,000 | 152,267,267 | 394,129,249 |

(Footnotes 6, 7, and 8, while not in the Commission's report, are relevant.)

[1] The modified C. & M. bonds will be extended to 1969 at 4 percent, with the lien of the mortgage undisturbed and will be assumed by the new company. The new note will mature Jan. 1, 1954, bear fixed interest at the rate of 2½ percent, and contingent interest at the rate of 1½ percent, payable pro rata with the contingent interest on the general-mortgage bonds. The notes will be redeemable in whole or in part on 60 days' notice at a premium of one-twentieth of 1 percent for each 6 months of unexpired term. They will be collaterally secured.

[2] Unlimited in amount, redeemable on 60 days' notice at premiums, benefits of a contingent $200,000 sinking fund, special sinking funds, when debt exceeds specified limits and provisions for a capital fund.

[3] Unlimited in amount redeemable on 60 days' notice at par plus interest, convertible into preferred stock at 10 shares per $1,000 bond; will contain covenants similar to those in the first mortgage relating to capital fund, restricting pledges and distributions to stock and the benefit of ½ percent sinking fund.

[4] Authorized amount of preferred stock in the discretion of reorganization managers, dividends cumulative to the extent earned but not paid, redemption price of $105, equal or superior (under specified conditions) voting rights to common stock. Convertible into common stock share for share.

[5] No-par-value common stock stated at $100 a share.

[6] By order of June 15, 1945, the court ordered that the Choctaw & Memphis Railroad Company 5-percent first-mortgage bonds shall remain undisturbed in the reorganization.

[7] By various orders of the court, the bank creditors were permitted to dispose of their collateral and are barred from making any claim against the debtor. Purchasers of the collateral will be allotted the reorganization securities herein allotted the bank creditors.

[8] On November 8, 1944, the court ordered the claim of the Reconstruction Finance Corporation paid, and under its order of June 15, 1945, any securities issued in respect of the collateral held by it are to be held in the treasury of the reorganized company.

the remaining secured creditors have claims which under the terms of the plan are not wholly satisfied. The Commission ordered that the no-par value common stock be stated at $100 a share. By taking the new common stock at $100 per share, the secured creditors show a deficiency in their claims of about $54,000,-000. If the same stock is taken at $50 per share, a figure higher than its present selling price, the deficiency in the secured creditors' claims amounts to almost $106,-000,000. The full or absolute priority rule as enunciated in Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, refers to the creditors' debts taking priority over all stockholders' claims. In the case of Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110, the "Court reaffirmed the 'familiar rule' that 'the stockholder's interest in the property is subordinate to the rights of creditors. First, of secured, and then of unsecured, creditors.'" It follows, therefore, that the secured or senior creditors have priority over all groups. Here the senior creditors show a large total deficiency under the proposed distribution. The debtor's claim that the junior or unsecured creditors should receive more under the proposed distribution is untenable, for in any new plan of distribution among the various classes the deficiency of approximately $106,000,000 claims of the senior creditors are not, and, first must be, satisfied.

In Brooks v. St. Louis-San Francisco Ry. Co., supra, the Commission made no provision for the general creditors and stockholders. The appeal was resolved upon the issue whether the plan of the Commission and the order of the District Court approving the plan should be reversed in order to provide for the general creditors and stockholders. As stated, the allocations were less liberal than in the instant case, and the court following the tenets of the Ecker and Group of Institutional Investors cases, held that the action of the Commission and order of the District Court must be sustained as they were supported by substantial evidence and an application of proper legal standards.

The mortgage trustee of the Little Rock & Hot Springs Western Railroad Company (hereinafter referred to as Little Rock) is in the unique position of being the only secured creditor to reject the plan of reorganization and appeals from the order of the District Court approving it. The Little Rock line is of undeniably strategic value to the debtor. It is about fifty-five miles in length, and while the debtor through one of its subsidiaries owns and operates just twenty-two miles of the line, these twenty-two miles are the connecting link between debtor's southern subsidiaries and the balance of its system. The other thirty-three miles of the line are owned and operated by the Missouri Pacific system. Apparently, its mileage in the Little Rock line is as vital to the Missouri Pacific as the smaller number of miles in the same line is to the debtor, because the Commission in June, 1937, placed a reproduction cost valuation, as of December 31, 1935, of about $1,500,000 on that portion of the security of the Little Rock bonds included in the Missouri Pacific system. At the same time the Commission placed a reproduction cost valuation of about $694,-000 on the corresponding security for the Little Rock bonds included in the debtor's system. The total Little Rock bond issue is $1,140,000 which investment represents a lien upon the entire line.

Under the modified plan of reorganization the Little Rock creditors receive $643,256 in cash, bonds, and stock. On a straight mileage prorate basis the lien on the Rock Island system is $453,600. On December 21, 1945, the District Court of Missouri approved the Commission's plan of reorganization for the Missouri Pacific Railroad Company, 64 F.Supp. 64. This provided that the Little Rock creditors be allotted $1,504,800 in bonds and preferred stock for their lien on that portion of the line operated by the Missouri Pacific.

The trustee for Little Rock contends that the allocation to its creditors under the plan of reorganization must be measured by the fair value to the debtor of that portion of the secured line which is owned by the debtor. And as the plan adopted failed to follow such a measure,

the Commission did not follow the essential legal standards in determining the value of the security for the Little Rock bonds. This appellant points to the Group of Institutional Investors case, which emphasized that Congress made earning power the primary criterion to be followed by the Commission in determining value for reorganization purposes.

In determining the allocation of securities for Little Rock the Commission held in its Supplemental Report of April 6, 1942, 252 I. C. C. 483, 493, that the Little Rock's allocation could not be figured on a contributed-traffic basis but, instead, it should be figured on a mileage prorate basis as "reflecting status as essentially a bridge line," i. e., a line which originates or terminates little or no traffic. This finding was approved by the District Court. Thus, the question involved is whether this court believes the Commission's finding is supported by material evidence. If we so believe, our review is at an end and we must affirm, Ecker v. Western Pacific Railroad Corp., supra, 318 U.S. 472, 63 S.Ct. 692, 87 L.Ed. 892. We believe the Commission's finding is supported by substantial evidence, because not only is the Commission the best informed to make value appraisals, but from the equities of the situation, if the Little Rock is treated in any manner other than a bridge line, its creditors would receive considerably more than one hundred cents on the dollar plus interest. In oral argument this appellant conceded it was seeking no more than one hundred cents on the dollar plus interest. While we must assume the proportional allocation of securities under the Missouri Pacific plan, the total in cash and securities under the two plans amounts to approximately $1,000,000 more than the amount of the bond issue, which totals $1,140,000, Cf. In re Chicago & N. W. Ry. Co., 7 Cir., 126 F.2d 351. It matters not that this group by vote has rejected the allocations it is to receive, for adequate provision has been made for these creditors.

 This appellant further complains that it is illegal to provide as is done in the plan of reorganization for the "sale

at not less than a fair upset price to be fixed by the court, of all or any part of the properties of the debtors, all on such conditions and in such manner as the court may direct." It is argued that such a severance of the Little Rock line, as this contemplates, is a piecemeal sale of an entire line which is not provided for in § 77 and consummation of such a plan would be contrary to the Fifth Amendment of the Constitution.

 These objections were made before the District Court. We believe they were definitely answered below in the first opinion, 50 F.Supp. 835, 861. "This provision [sale] is based upon subsection b (5), which authorizes 'the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price.'" As to the deprivation of substantive rights without due process of law, the court took cognizance of the impossibility of the sale of the entire mortgaged property as a unit. It observed, at p. 861, "this court has no jurisdiction to order the sale of property, not owned by any debtor herein, * * *." Approximately three-fifths of the Little Rock line is owned by the Missouri Pacific. This property is in the jurisdiction of the District Court of Missouri. It is not in the jurisdiction of this court. Moreover, the aforementioned legislative provision in the Act which authorizes the sale of any part of the property of the debtor must be presumed to be constitutional, Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; Contract Cartage Co. v. Morris, D.C., 59 F.2d 437.

In 8938, the convertible bondholders are an unsecured creditor group. Under the modified plan they receive four shares of stock for each $1,000 bond. Such a distribution represents approximately 34% of their claims. These bondholders contend that the value of the property of the debtor and of the securities and cash on hand is sufficient to satisfy the claims of all creditors in full. This question was disposed of in answering the debtor's contentions and to repeat it here would be repetition. As the Commission followed legal

standards in adopting the modified plan of reorganization and the District Court performed its functions as prescribed by the statute, any argument as to insufficiency of the new corporate structure and distribution of assets among the creditors must be rejected, and any claim as to the unfairness and inequities of the plan must fail for the same reason.

Appellants' counsel, in his brief and again in oral argument, urged that the Chase National Bank as trustee for the issue of unsecured convertible bonds and the holder of collateral for loans extended to the debtor was in the exercise of a dual and conflicting role and that in the exercise of this dual role, the bank violated its position as fiduciary to the convertible bondholders by retaining or conveying to others, the property of the debtor. A consideration of the cogency of such an argument is not related to the merits of the plan of reorganization which is the question before this court. The contentions of the convertible bondholders must be denied.

The order of the District Court is affirmed.