942

CHESTON et al. v. CHASE NAT. BANK
et al.

Nos. 9203–9208.

Circuit Court of Appeals, Seventh Circuit.

Feb. 21, 1947.

Rehearing Denied April 7, 1947.

See also 160 F.2d 949.

In No. 9203:

Edward W. Bourne and C. W. Sorrell, both of New York City, F. H. Towner, of Chicago, Ill., Jesse E. Waid and Alexander & Green, all of New York City, Winston, Strawn & Shaw, of Chicago, Ill., and White & Case, of New York City, for appellants.

Loy McIntosh, of Chicago, Ill., John Gerdes, of New York City, Henry F. Tenney and W. F. Peter, both of Chicago, Ill., Orville W. Wood, of New York City, Edward R. Johnston, of Chicago, Ill., Harry Kirshbaum, of New York City, Michael Gesas, Gann, Secord, Stead & McIntosh and Poppenhusen, Johnston, Thompson & Raymond, all of Chicago, Ill., and Milbank, Tweed, Hope, Hadley & McCloy, and Walter H. Brown, Jr., all of New York City, for appellees.

In No. 9204:

Wilkie Bushby, Joseph Schreiber, and Root, Ballantine, Harlan, Bushby & Palmer, all of New York City, for appellant.

Loy McIntosh, of Chicago, Ill., John Gerdes, of New York City, and Henry F. Tenney and Gann, Secord, Stead & McIntosh, all of Chicago, Ill., for appellees.

In No. 9205:

Alexander M. Lewis, of New York City, Irwin T. Gilruth, of Chicago, Ill., and Rathbone, Perry, Kelley & Drye, of New York City, for appellants.

Loy McIntosh, of Chicago, Ill., John Gerdes, of New York City, and Henry F. Tenney and Gann, Secord, Stead & McIntosh, all of Chicago, Ill., for appellees.

In No. 9206:

Sanford H. E. Freund and Shearman & Sterling & Wright, all of New York City, for appellants.

Aaron Colnon, of Chicago, Ill. (and other counsel in No. 9203), for appellees.

In No. 9207:

Daniel James and Cahill, Gordon, Zachry & Reindel, all of New York City, for appellants.

Aaron Colnon, of Chicago, Ill. (and other counsel in No. 9203), for appellees.

In No. 9208:

Edward K. Hanlon and Beekman & Bogue, all of New York City, for appellants.

Aaron Colnon, of Chicago, Ill. (and other counsel in 9203), for appellees.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

KERNER, Circuit Judge.

This proceeding, culminating in a plan of reorganization of The Chicago, Rock Island & Pacific Railway Company under § 77 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205, was commenced on June 7, 1933. The plan was approved by the Interstate Commerce Commission on May 1, 1944, and approved by the trial judge on June 15, 1945. On appeal this court examined the plan pursuant to the statute, endorsed the Commission's method of valuation, and affirmed the order approving the plan on May 23, 1946 (157 F.2d 241). Under the plan all creditors are provided for in varying degrees. The plan provides a capitalization of $356,117,327, based on the Commission's determination of the earning power of the property, past, present and future. This capital structure is divided into first mortgage bonds, second mortgage income bonds, preferred stock having a par value of $100 per share, and 1,522,672 shares of no par value common stock.

The record discloses that while the proceeding was pending in this court, the District Court directed the Interstate Commerce Commission to submit the plan for acceptance or rejection to eleven classes of creditors. February 26, 1946, the Commission certified to the court that the plan had been accepted by nine classes of creditors and rejected by the holders of the Little Rock and Hot Springs Western Railroad Company First Mortgage Bonds and the holders of the Convertible Bonds. The Convertible bondholders are an unsecured creditor group and under the plan they receive four shares of stock for each $1,000 bond. Of the nine classes who voted for the plan, one, the holders of the Peoria Railway Terminal Company First Mortgage Bonds, would not have the principal amount or character of their securities changed—the plan provides only for an extension of the maturity and a reduction of the interest rate. The Choctaw & Memphis First Mortgage Bonds are wholly satisfied. The holders of the General Mortgage Bonds would receive new bonds and stock, satisfying their claims in full. The other six classes would receive new bonds and stock which, if the new no par value common stock be treated as worth $50 a share, would fail to satisfy their claims by almost $106,000,000. Under the plan, out of a total issue of 1,522,672 shares of the common stock, 160,078 shares are allotted to the holders of the Convertible Bonds. The result was to provide for the holders of these bonds a 10.68% interest in the equity of the reorganized company, and if the plan is consummated, the Convertible bondholders will participate in any larger earnings than the Commission's forecast anticipated.

Objections to confirmation of the plan were filed, and the objectors moved for reexamination of the plan in the light of changed circumstances since the plan's approval by the Commission on May 1, 1944. The claimed changed conditions were (a) accumulation of cash, (b) elimination of creditors, (c) increased earnings and improvement in the asset position, and (d)

944

reduction in equipment debt. Hearings were had on the objections pursuant to subsection e of § 77 of the Bankruptcy Act, and the court found that the plan did not make adequate provision for fair and equitable treatment of the claims of the holders of the Convertible Bonds; that their rejection of the plan was reasonably justified; and that the plan does not conform to the requirements of subsection e of § 77 of the Act. In the order he directed that the plan be not confirmed and that "the case be referred back to the Interstate Commerce Commission * * * for further proceedings * * * in accordance with the opinion[1] of this Court * * *, including the consideration of modifications of the Plan or the proposal of new plans." It is this order that appellants seek to reverse.

The question is whether the plan should have been confirmed.

Before we proceed to discuss the question involved we note that appellees have moved that the appeals be dismissed on the ground that the order refusing to confirm the plan adjudicated no rights of the parties. Section 24, sub. a, of the Chandler Act, 11 U.S.C.A. § 47, sub. a, gives the Circuit Courts of Appeals appellate jurisdiction from courts of bankruptcy "in proceedings in bankruptcy, either interlocutory or final * * *." We agree with appellants that the development, approval, confirmation, and consummation of

---

[1] In his opinion, no distinction was made between developments which took place prior to the approval of the plan by the Commission on May 1, 1944, or the District Court on June 15, 1945, and developments which took place after one or both of those dates, and after reciting statements made before the Committee on Interstate Commerce of the Senate during the months of February and March, 1946, while considering Senate Bill 1253, and making mention of criticisms directed against the Commission and the District Courts for the reductions in capitalization effected by their plans of reorganization, the trial judge said: "In the present case we have a plan that except for slight modifications was prepared by the Commission in 1940 and rests on studies of earnings, etc., going back to 1937 and even beyond.

"Against that we find the Debtor today with cash, or equivalent of over $70,-000,000; with an R.F.C. loan * * * in excess of $18,000,000, paid in full; with the entire first mortgage of the Peoria Terminal Co., [has been] to all intents and purposes paid in full; with over 20% of the Choctaw & Memphis first mortgage retired; and with an amazing reduction, in the interim, of equipment debt. Three classes of creditors set up in the original Plan have disappeared—the banks, the R.F.C., and the Peoria Railway Terminal Co.

"The above recital does not take into account the tremendous sums expended over the period on improvement of road and equipment, nor does it include the retirement of debt on jointly owned facilities such as the Joliet and Denver terminals.

"Certain it is that if Congress and the Commission now feel that reorganization plans prepared prior to the war did not properly evaluate the financial benefits flowing from the revenues of the war years, then this present case merits further review and consideration.

"The various bills presented in, and hearings held by Congress open up a new vista of hope for the junior creditors and stockholders of the bankrupt railroad corporations.

"However, in holding out hope to the junior creditors and stockholders, this court, above all, would not have that hope illusory. The Commission cannot throw to the winds all consideration of future earnings, nor can it perform miracles. The war revenues are past, higher costs of labor and materials, and many other new problems beset railroad management. With the most optimistic approach by the Commission it would be vain for the junior creditors to expect to be made whole.

"It would seem, with the sound background that exists, this Court's trustees, by making use of available cash, together with the proceeds of a conservative loan * * *, should be able to pay, at equitable prices, the General Mortgage and all of the relatively small divisional first mortgages.

"This would achieve for the First * * * Mortgage, the Secured Bondholders, and all junior security holders a greater strengthening of their position and a chance for all to share to a larger degree in the securities of the reorganized company. Such a program would be in line with the debt retirement by trustees so strongly urged by the Chairman of the Senate Committee and would have the undoubted cooperation of the Commission."

a plan of reorganization are not mere steps of an ordinary law suit, and whether we consider the order interlocutory or final, the fact remains that the order was one of substance, entered in a proceeding in bankruptcy which this court has power to dispose of on the merits; hence the motion must be, and it is, denied.

Appellees contend that the evidence presented to the court justified a remanding of the plan.

On the other hand, appellants make the point that the court's approval of the plan established as a matter of law that the plan was "fair and equitable" at the time the Commission approved it, and they contend that a rejection would not be reasonably justified unless the dissenters had a valid reason for their vote.

We have been told that in examining these contentions we must approach the problem in accordance with our reviewing authority under § 77 of the Bankruptcy Act. Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1384. Subsection (e) provides, in part, as follows:

"Upon receipt of such certification, the judge shall confirm the plan if satisfied that it has been accepted by or on behalf of creditors of each class to which submission is required under this subsection * * * Provided, That, if the plan has not been so accepted by the creditors and stockholders, the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e): * * * If the judge shall not confirm the plan, he shall file an opinion, with a statement of his conclusions and his reasons therefor, and enter an order in which he shall either dismiss the proceedings, or, in his discretion and on the motion of any party in interest, refer the case back to the Commission for further proceedings, including the consideration of modifications of the plan or the proposal of new plans."

Under this statute a rejection would not be reasonably justified unless the rejectors have a valid reason for rejecting the plan. If there is a rejection, the court will reexamine the plan, but if the plan is found to be fair and equitable to the dissenters, they cannot use the elements making the plan fair and equitable as the basis of their rejections. Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra, 328 U.S. 534, 66 S.Ct. 1303. Thus it is clear that the court's discretion is not unlimited, but is circumscribed, and until the statute is satisfied, no discretion is vested in the court.

With these observations in mind, we proceed to an examination of the evidence presented by the objectors, which, of course, must be considered in connection with the entire record of these proceedings.

*Accumulation of Cash.* On June 1, 1946, there were cash and cash equivalents in the debtor's treasury in the sum of $77,563,059, but net cash of only $10,997,108. The principal reasons for the difference is that $33,886,514 has been allocated to accrued taxes, cash reserve and working capital; $1,142,000 to debt reduction; $57,521 to current interest charges; $12,313,130 to requirements for additions and improvements; and $19,166,786 for plan requirements.

The effective date of the plan is January 1, 1944, and it treats the claims of the creditors as of that date. This means that the new bonds and preferred stock will be entitled to interest and dividends from that date. Any gain after that time was a benefit to the new common stockholders. Reconstruction Finance Corp. v Denver & R. G. W. R. Co., supra, 328 U.S. 521, 66 S.Ct. 1296. For the period since January 1, 1944, the creditors have received no interest. This interest to May 1, 1946, amounts to over $27,000,000.

*Elimination of Creditors.* September 20, 1945, the court authorized the purchase of all or any part of $3,524,000 of Choctaw & Memphis Bonds at $1,625 per bond. Under

the plan, holders of these bonds were entitled to receive $500 of accrued interest in cash, so the order authorized a cash disbursement exceeding that required by the plan by $1,125 per bond, or a total in excess of $3,964,500. The trial judge in his opinion stated that over 20% of these bonds had been retired and we assume that to be true. This would result in a net debt reduction, not required by the plan, of $704,-800. The net reduction in the new capitalization would also be $704,800. As of January 1, 1944, the Peoria Terminal Bonds, not included in the capitalization of the reorganized company, totaled $928,-000. November 29, 1945, the court authorized the payment of these bonds and on November 8, 1944, directed the payment of the claim of the RFC, resulting in a net reduction, not required by the plan, of $17,116,842. The effect of the payment of the Peoria Terminal Bonds and the claim of the RFC and the retiring of a portion of the Choctaw & Memphis Bonds will be to place into the treasury of the reorganized company new securities consisting of First Mortgage Bonds, Income Bonds, notes, preferred stock, and 111,437 shares of common stock.

The effect of these various payments were before us at the time of the prior appeal, and it did not deter our approving the plan as supplemented by these orders of the court. Now, our former holding is reinforced by apt language of the Supreme Court in the Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra, 328 U.S. 525, 66 S.Ct. 1298:

"When proposed capitalization is being planned on earnings, a reduction of senior capital without reduction of estimated earnings increases possible junior capital within the scheme. When the reduction of senior capital takes place after the adoption of the plan by use of anticipated earnings or existing cash, there can be no such readjustment of junior participation because assets in the balance sheet at the adoption of the plan and subsequent earnings are, as we have pointed out, for the benefit of the stockholders in the new company so that through these common stock advantages these new stockholders may be compensat-

ed for their loss of payment in full in cash."

*Increased Earnings.* Appellees concede that inflated war earnings cannot be considered as a guide for future estimates of income, but they say that four years of wartime operation have brought into the general fund huge profits which have had a substantial effect on the capital position of the debtor, and they contend that it is this change which justified the order referring the proceedings to the Commission. They rely on matters relating to the (1) Bravo-Santa Rosa line, (2) the improvement in the asset position of the debtor, and (3) the claim of the debtor against the Rock Island Improvement Company.

In this regard the trustee for the Convertible Bonds calls attention to the earnings of a part of the Bravo-Santa Rosa line, all of which line is subject to a lien of a mortgage securing $3,600,000 of Chicago, Rock Island & El Paso Bonds, which are pledged to secure the First and Refunding Mortgage. At the hearing on the objections, this trustee presented an exhibit showing the net earnings of the Tucumcari-Santa Rosa line, a part of the Bravo-Santa Rosa line, but it made no allowance for federal income and excess profits taxes. Had provision been made for these taxes, the results for the various periods of years would have been as follows: Average for "Formula Years" 1936-1937 $127,531: fifteen-year average 1926-1940 $138,692: and two-year average 1944-1945 $145,623. From this evidence it appears that the latest earnings were slightly more than the average for the years 1936–1937 or the years 1926–1940.

The trustee for the Convertible Bonds also presented evidence tending to show the improvement in the asset position of the debtor resulting from the accumulation of cash and its application to debt reduction and to improvements to the property since May 1, 1944. We think we have heretofore sufficiently set forth the facts. As to the claim against the Rock Island Improvement Company, it is urged that, the debtor's money having been used to pay the claim of the RFC and the bonds of the Rock Island Improvement Company which

were pledged to the RFC having been returned to the debtor's treasury, the allocations of securities under the plan should be changed. This argument, we believe, is untenable in view of what we have said in *Elimination of Creditors.*

The Convertible bondholders and the debtor presented exhibits showing the amounts of revenue received by the debtor for the years ending December 31, 1943, 1944, and 1945, as follows: 1943 $37,037,708; 1944 $26,415,919; and 1945 $20,444,571.

In considering these figures we must not lose sight of their background. They are war earnings, and the Supreme Court has approved the Commission's attitude in appraising them lightly. Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra, 328 U.S. 520, 66 S.Ct. 1295. A further examination of appellees' figures merely confirms the sagacity of the Supreme Court's holding, because in 1945 the earnings of the debtor had dropped to almost fifty per cent of what they had been in the top year of 1943. Moreover, the debtor's income during these puffed years has dropped steadily since 1943, and the figures in question, while showing annual income after taxes, do not include the payment of interest which, as previously pointed out, as of May 1, 1946, was in excess of $27,000,000.

*Reduction in Equipment Debt.* Convertible bondholders' Exhibit 2 shows the reduction of the equipment debt, but the retirement of equipment obligations outstanding as of January 1, 1944, was one of the contentions advanced in this court in the appeal from the order approving the plan, and was discussed in our opinion. 7 Cir., 157 F.2d 241, 246. It needs no further discussion.

From what we have thus far said, it is clear that factually the progress of the plan of reorganization in our case is comparable in many ways with Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra. In that case the District Court approved the plan as certified by the Commission, after which it was submitted to the creditors entitled to vote and all groups approved it with one exception. The

District Court, exercising its recognized statutory powers, held the rejection "not reasonably justified" and confirmed the plan. Upon appeal, the Circuit Court of Appeals held the rejection to be "reasonably justified" and remanded the proceeding to the Interstate Commerce Commission for further consideration, 10 Cir., 150 F.2d 28, 40. In its consideration of the case, the Supreme Court found that the Commission had reached a valuation supported by substantial evidence. This is especially significant, because the Commission's capitalization while reached in 1943 showed no substantial increase from 1938, the year of first draft of the plan. The court in our case relied upon a period of years almost identical with the above period. In Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra, the junior creditors received 10% of their claims, all in common stock. In our case the Convertible bondholders receive about 17% of their claims, all in common stock, if the stock is taken at $50 per share. An aspect of stock ownership, says the Supreme Court, is that creditors receiving common stock obtain an interest in all cash on hand or all cash that might be accumulated. 328 U.S. 519, 66 S.Ct. 1295.

The Supreme Court also found that the Circuit Court of Appeals' reversal of the District Court was based primarily on the grounds that large earnings accruing during the war after approval of the plan by the Commission should be for the benefit of the dissenting junior creditors, but the Supreme Court reversed the Circuit Court of Appeals.

Regarding changed economic conditions after approval of a plan (which is the nub of our problem), the Supreme Court said: "Changes in economic conditions cannot effect the powers of the reorganization agencies even though such changes may require a reexamination into the present fairness of the former exercise of those powers." 328 U.S. 512, 66 S.Ct. 1291. To us this statement means that changes in economic conditions cannot be used as a wedge to have the Commission reexamine its former valuation figures. This quoted statement would appear to be conclusive of our problem, since this court examined

the plan in the manner prescribed in Ecker v. Western Pacific R. R., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, and Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, and by affirming the order approving the plan, established that the plan was fair and equitable.

Cash and war earnings, as we have already noted, is our principal problem. It was the crux of Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra. One of the most important points made in that case was, assuming that there is sufficient evidence to justify the valuation as determined by the Commission, that determination cannot be rejected on the grounds of subsequent economic change by any class of creditors, nor can such a rejection be "reasonably justified" by any court, providing that the Commission has envisaged and considered the changes. 328 U.S. 521, 66 S.Ct. 1296. What this would seem to mean for our purposes is that if there were sufficient evidence to justify the Commission's determination of value as fair and equitable (and we so found, 157 F.2d 241), then a creditor's rejection and the District Court's acquiescence can be sustained only if the plan failed to consider subsequent economic changes. But the Commission did consider possible subsequent economic changes.

In its report of January 3, 1944, 257 I.C.C. 265, 286, the Commission said:

"While the record shows that the current earnings of the debtor are greatly in excess of the estimated 'normal' income of the reorganized company, we do not believe that the economic conditions which made them possible are of such a permanent character as to warrant increasing the total capitalization heretofore approved."

In its report of May 1, 1944, 257 I.C.C. 307, 308, the Commission said:

"In our supplemental report of January 3, 1944, we pointed out that with only the approved amount of reorganization securities available for distribution, as of the new effective date of the plan, and including the distribution of $38,011,922 surplus cash, there would be a deficiency of over $80,000,000 in the provision for credi-

tors' claims * * *. We further stated that, in our opinion, the improved current earnings and cash position of the debtors did not warrant an increase in the total approved capitalization. Upon further consideration, we reaffirm our finding and conclusions in these respects."

To us these quotations from the reports of the Commission, whose judgment we are obliged to respect, show the acumen of that body in the consideration of possible economic changes and they put to flight any flimsy contention of the development of unforeseen conditions. Any future estimates made by the Commission of the debtor's financial position subsequent to May 1, 1944, were of necessity colored with an element of uncertainty. When changes in economic conditions occur, as they are bound to do, a court may not set aside a plan previously determined fair and equitable by the Commission when the changes are such that they have been foreseen and considered by the Commission in formulating the plan. At the expense of repeating what we said previously (157 F.2d 241, 248) "claims of the senior creditors are not, and, first must be, satisfied." In view of that statement which the appellees cannot reasonably dispute, and the tragedy of delay, which has plagued this and so many railroad reorganizations, it appears to have been erroneous on the part of the District Court not to have confirmed the plan.

We now pause to consider the second opinion rendered in the Denver case (Insurance Group Committee v. Denver & R. G. W. R. Co.), 67 S.Ct. 583. What does this opinion add to the principles laid down in the prior opinion? In truth very little, but what is important, it does not deny or refute anything said previously.

The debtor in that case was responsible for the second opinion. After consistently opposing the plan throughout the proceedings, it moved in the District Court for reexamination of the plan in the light of changed circumstances since the Commission hearings in 1941. Upon dismissal, the Circuit Court of Appeals granted an order staying execution until the appeal should be considered. Petition for certi-

orari was granted before judgment. Specifically, the alleged changed conditions as urged by the debtor were: (a) radical lowering for the indefinite future of money rates; (b) beneficial effects of the permanent elevation of national income; (c) purchase by private capital of a huge steel plant near the debtor's property indicated increased business and higher earnings.

From the outset, the Court makes it clear that the types of changed circumstances urged are not sufficient and "that the debtor has failed to allege the existence of changed conditions since our decision of June 10, 1946, of a kind not 'Envisaged and considered by the Commission in its deliberations upon or explanations of the plan.'" 67 S.Ct. 585. Nothing could be more germane than the above statement which is taken from the earlier opinion. In reemphasizing its position and perhaps being even more definite than formerly, the Court states unequivocally that "there must be a showing of substantial injury." 67 S.Ct. 588. This would seem to preclude the case of the Convertible bondholders, because in reality they are not claiming "substantial injury" but are urging the very elements which we previously found made the plan fair and equitable.

Further, the Supreme Court as if to silence any vestige of junior complaints (and this would apply to our case) says there can be no reexamination of a plan until it can be shown with some reasonable support that the senior creditors have received more than the face of their claims. 67 S.Ct. 588. It is true that the juniors in our case have contended this to be so, but we rejected their contentions in the previous opinion, and found there was not the element of "reasonable support."

The Supreme Court's discussion, naturally, is of a confirmed plan of reorganization, which is not the situation in our case. However, in view of the Supreme Court's complete rejection of contentions of alleged changed conditions comparable to those advanced here, there can be little doubt that what was said in the second Denver case is also applicable here.

The trial judge's position in reexamining the plan for purposes of confirmation apparently "does not differ from that for the original court approval under the first paragraph of subsection c." Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., supra, 328 U.S. 534, 66 S.Ct. 1302. Whether he has the right to refuse to confirm in the face of overwhelming evidence seems non-existent. In view of the factual development in our case since approval of the plan and the clear statements of the Supreme Court in the two Denver cases, his action in refusing to confirm, it seems to us, was an error of law.

The order of the District Court refusing to confirm the plan and referring the proceedings to the Interstate Commerce Commission is vacated and the case is remanded to the District Court with instructions to confirm the plan.

